RECOMMENDED FOR FULL-TEXT PUBLICATION
Pursuant to Sixth Circuit Rule 206

ELECTRONIC CITATION: 2003 FED App. 0216P (6th Cir.)
File Name: 03a0216p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

---

UNITED STATES OF AMERICA,
*Plaintiff-Appellee,*

v.

No. 01-3696

DAVID L. MAYLE,
*Defendant-Appellant.*

Appeal from the United States District Court
for the Northern District of Ohio at Akron.
No. 01-00082—James Gwin, District Judge.

Argued: February 4, 2003

Decided and Filed: July 1, 2003

Before: BOGGS and NORRIS, Circuit Judges; BELL,
Chief District Judge.[*]

---

### COUNSEL

**ARGUED:** John B. Gibbons, Cleveland, Ohio, for
Appellant. James C. Lynch, ASSISTANT UNITED STATES
ATTORNEY, Cleveland, Ohio, for Appellee. **ON BRIEF:**

---

[*] The Honorable Robert Holmes Bell, Chief United States District
Judge for the Western District of Michigan, sitting by designation.

John B. Gibbons, Cleveland, Ohio, for Appellant. James C.
Lynch, ASSISTANT UNITED STATES ATTORNEY,
Cleveland, Ohio, for Appellee.

---

### OPINION

---

BELL, Chief District Judge. Defendant David L. Mayle
appeals his sentence of 360 months in prison on a conviction
that carried a pre-departure sentencing guideline range of 15
to 21 months. For the reasons that follow, the sentence will
be AFFIRMED.

### I.

Defendant was charged in a five-count indictment with
three counts of mail fraud in violation of 18 U.S.C. § 1341,
one count of forging Treasury checks in violation of
18 U.S.C. § 510(a)(1), and one count of making a false
statement to a federal agent in violation of 18 U.S.C. § 1001.
The indictment alleged that between November 1, 1995 and
November 1, 1996, defendant fraudulently forged and cashed
Supplemental Security Income ("SSI") checks from the Social
Security Administration totaling $5,073.25 that were made
payable to Joseph Newman.

After a two-day jury trial, defendant was found guilty on all
five counts of the indictment. Defendant's presentence report
reflected an offense level of 14 and a criminal history
category of I, which, in the absence of any departures, would
have resulted in a sentencing range of 15 to 21 months. The
government moved for an upward departure.

After a two-day evidentiary hearing, the district court
concluded that defendant murdered Newman and that the
murder constituted relevant conduct because it facilitated the
fraud offense for which he was convicted. The district court
accordingly increased defendant's base offense level by 23 to
level 37 pursuant to U.S.S.G. § 5K2.1 because a death

resulted. The district court also granted the government's motion to increase defendant's criminal history category based upon the court's finding that defendant was responsible for the death of Brett Woehlk in 1990 and the death of Harrison Hazzard in 1994. The district court determined that application of the Sentencing Guidelines would not accurately reflect the seriousness of defendant's criminal history or the danger he posed to others. The district court accordingly adjusted defendant's criminal history from category I to category IV. The resulting sentencing range was between 292 and 365 months. The district court imposed a sentence of 360 months, consisting of consecutive terms of five years of imprisonment on each of counts one, two, three, and five, and ten years on count four pursuant to U.S.S.G. § 5G1.2(d).

On appeal defendant does not contest his underlying conviction or the pre-departure Sentencing Guideline calculations. His challenges relate solely to the district court's upward departures from the Sentencing Guidelines.

## II.

The district court's upward departures were based upon its finding that the government had proved that defendant murdered Woehlk, Hazzard and Newman.[1] On appeal, defendant argues that the evidence was not sufficient to enable the district court to make these findings.

_____

[1] The government's evidence with respect to a third alleged victim, Scott Cohen, consisted solely of police records concerning a complaint filed with the Tampa, Florida, police regarding the theft of three night deposits totaling over $7,000 from the Farm Store between May 19 and May 21, 1989. The police report reflected that defendant was the manager of the Farm Store and that defendant blamed the missing deposits on his employee, Scott Cohen. Cohen disappeared after he left the store with the deposit. Although the district court had suspicions that defendant was responsible for the death of Cohen, the district court determined that the government had failed to establish this fact. Accordingly, the sufficiency of this evidence is not before the court.

The standard governing our review of a sentence is established by statute:

> The court of appeals shall give due regard to the opportunity of the district court to judge the credibility of the witnesses, and shall accept the findings of fact of the district court unless they are clearly erroneous and shall give due deference to the district court's application of the guidelines to the facts.

18 U.S.C. § 3742(e). Accordingly, when reviewing a district court's sentencing decisions, we "will disturb the underlying factual findings only if they are clearly erroneous." *United States v. Ennenga*, 263 F.3d 499, 502 (6th Cir. 2001) (quoting *United States v. Hill*, 79 F.3d 1477, 1481 (6th Cir. 1996)).

Defendant contends that the district court's finding that he murdered the three individuals was clearly erroneous because the evidence was not sufficient to meet the clear and convincing standard of proof. The Supreme Court has held that application of the preponderance standard at sentencing generally satisfies due process. *United States v. Watts*, 519 U.S. 148, 156 (1997) (citing *McMillan v. Pennsylvania*, 477 U.S. 79, 91-92 (1986); *Nichols v. United States*, 511 U.S. 738, 747-748 (1994)). The Court did acknowledge in *Watt*, however, that there was "a divergence of opinion among the Circuits as to whether, in extreme circumstances, relevant conduct that would dramatically increase the sentence must be based on clear and convincing evidence." 519 U.S. at 156 & n.2 (citing cases).

Defendant relies on *United States v. Kikumura*, 918 F.2d 1084 (3d Cir. 1990), in support of his contention that the evidence relied on at sentencing must be measured against the clear and convincing standard because the evidence had a dramatic effect on his sentence. In *Kikumura,* the Third Circuit held that in an extreme context, such as where the sentencing court's findings would increase the sentence from 30 months to 30 years, the sentencing court must apply the clear and convincing standard of proof in order to satisfy its obligation to make findings under 18 U.S.C. § 3553(b).

*Kikumura*, 918 F.2d at 1100-01. *See also United States v. Hopper*, 177 F.3d 824, 833 (9th Cir. 1999) (requiring proof by clear and convincing evidence in exceptional cases "when a sentencing factor has an extremely disproportionate effect on the sentence relative to the offense of conviction.").

Although the case before us undeniably presents one of those exceptional situations where the sentencing factor has a disproportionate effect on the sentence relative to the offense of conviction, this Circuit has previously rejected the invitation to adopt a higher standard of proof simply because the enhancement would significantly increase the defendant's sentence. *United States v. Graham*, 275 F.3d 490, 517 n.19 (6th Cir. 2001). We pointed out in *Graham* that as long as a sentencing factor does not alter the statutory range of penalties faced by the defendant for the crime of which he was convicted, the Supreme Court permits the factor to be found by a preponderance of the evidence. *Id. Accord United States v. Layne*, 324 F.3d 464, 473 (6th Cir. 2003) (following *Graham*). *See also United States v. Cordoba-Murgas*, 233 F.3d 704, 708-09 (2d Cir. 2000) (rejecting clear and convincing evidentiary standard at sentencing for uncharged murders); *United States v. Valdez*, 225 F.3d 1137, 1143 n.2 (10th Cir. 2000) (rejecting clear and convincing evidence standard at sentencing even though relevant conduct dramatically increased sentence).

The district court, in an abundance of caution, made its findings under both the preponderance of the evidence standard and the more exacting clear and convincing standard. Based upon the reasoning in *Graham*, we will review the sufficiency of the evidence only under the preponderance of the evidence standard.

## A. Brett Woehlk

The government presented evidence that, in 1990, defendant was the manager of the Farm Store, a convenience food store, in Tampa, Florida. Brett Woehlk was his employee. On Tuesday, April 3, 1990, defendant called his supervisor, Mary Abed, to report that the store's safe had been

robbed of the previous day's receipts. Further investigation revealed that the bank had not received the deposits on Friday, March 30, or Sunday, April 1. Defendant said Woehlk must have been responsible for the theft because defendant sent Woehlk to make the deposits on Friday and Sunday nights and because Woehlk was the only person other than defendant who had keys to the store and the combination to the safe.

Abed testified that defendant's report of the $11,000 in missing receipts raised her suspicions. When defendant opened the store on Saturday morning, he had sufficient change to operate the store for the day, which would indicate that the deposit was not made on Friday night. It was also against store policy to make deposits at night. Abed testified that the Friday night deposit should not have been made until Saturday afternoon, after defendant's shift. Abed also found it suspicious that although defendant went to the bank on Monday to make a deposit, he failed to obtain the verified deposit slips from the weekend even though he had always complied with this requirement in the past. Abed contacted her supervisor, Diane Binde. Binde testified that when she interviewed defendant, he told her that he had been at the store until 2:00 a.m. Monday morning, wiping down his car. Binde found this story peculiar because defendant was scheduled to be at the store at 4:30 a.m. that same morning to open. Binde suspended defendant from his employment.

Woehlk was last seen by his mother before he went to work on the evening of Sunday, April 1, 1990. Woehlk did not show up at his girlfriend's house that night as planned. Woehlk's car was found a few blocks from the Farm Store on Tuesday, April 3, 1990, with empty Farm Store bank bags in it. Woehlk's body was found on April 7, 1990, 266 feet off the road, clothed in a Farm Store shirt, wrapped in a carpet and covered with a piece of plywood. He had seven knife wounds, including a slash to his throat.

George McNamara, a police investigator, testified that he observed two people watching the police at the crime scene.

The individuals were identified as defendant and his live-in partner, Paul DeLay. During questioning, DeLay told the police that when defendant came home in the early morning hours of Monday, April 2, 1990, he had blood on his hands and took a shower. DeLay told police that defendant admitted that he killed Woehlk with a knife in an argument over money at the Farm Store and that he had hidden Woehlk's body underneath a piece of carpet in a field. DeLay also told police that defendant told him that he had moved Woehlk's car a few blocks away from the store. During a search of defendant's residence, the police found a set of keys to Woehlk's parents' home and a money order log from the Farm Store. The money order log reflected that defendant had purchased over $3,000 in money orders during Woehlk's shift on Sunday.

Defendant was charged with the homicide of Woehlk and with burglary and grand theft in connection with the loss of funds at the Farm Store. The murder charges against defendant were ultimately dismissed because DeLay recanted his story before the grand jury. Defendant was acquitted on the burglary and theft charges and moved to Canton, Ohio. DeLay was convicted of perjury for his false statements to the grand jury in Florida. After serving his jail term on the perjury conviction, DeLay followed defendant to Canton, Ohio.

At defendant's sentencing hearing in 2000, DeLay testified that around the time that Woehlk disappeared, defendant did not come home from work on time. DeLay called him several times at work. When defendant finally answered the telephone, he first explained that he had been in the bathroom and then changed his story to say that he had been washing his car. When defendant came home and DeLay asked him about the blood on his hands, defendant explained that he killed Woehlk over money from the Farm Store. DeLay testified that his original statement to the police in 1995 that defendant admitted killing Woehlk was true. DeLay testified that he lied to the grand jury because defendant had told him not to tell the police anything.

Defendant contends that the evidence was insufficient to permit a finding that he murdered Woehlk because there was no testimony from a coroner establishing that the cause of death was homicide. Defendant has cited no authority in support of his assertion that a coroner's opinion is required to establish the cause of death. There is no authority to that effect because this argument is legally untenable. The Sentencing Guidelines provide that "[i]n resolving any dispute concerning a factor important to the sentencing determination, the court may consider relevant information without regard to its admissibility under the rules of evidence applicable at trial, provided that the information has sufficient indicia of reliability to support its probable accuracy." U.S.S.G. 6A1.3(a). We have also previously observed that "[t]he Sentencing Guidelines and this circuit's case law have set a low bar for the kinds of evidence sentencing judges may rely on to decide factual issues at sentencing." *United States v. Wiant*, 314 F.3d 826, 832 (6th Cir. 2003) (citing U.S.S.G. § 6A1.3(a); *United States v. Greene*, 71 F.3d 232, 235 (6th Cir. 1995)). We review the evidence for its relevance and reliability, not for its conformity to conventional proofs.

The sentencing court permitted Officer McNamara to testify to his recollection of what the coroner ruled regarding Woehlk's death. Even though some of McNamara's testimony was hearsay, the district court may consider and rely on hearsay evidence as long as the evidence bears some minimal indicia of reliability. *United States v. Silverman*, 976 F.2d 1502, 1511 (6th Cir. 1992). McNamara's testimony regarding his recollection as to the cause of Woehlk's death was inherently reliable. He was an officer assigned to the homicide unit, he investigated the scene of Woelk's death, and he observed the slash wounds. Moreover, the precise cause of death was not a material issue at sentencing. The district court only needed to determine whether Woehlk was murdered and whether he was murdered by defendant. Woehlk's slashed body was found rolled up in a carpet and covered by plywood in a field. The fact that this was a murder was clear.

Defendant contends that even if the cause of death was established, there was insufficient evidence to support a finding that he was responsible for the death. Defendant notes that no murder weapon was found and that the police found no traces of Woehlk's blood during their search of defendant's car and house.

Despite the lack of weapon or blood evidence, there was ample reliable evidence to support a finding that defendant was responsible for Woehlk's death. Some of the evidence the district court highlighted in support of this finding was: defendant's presence at the store during the relevant time period; the implausibility of defendant's claim that he sent Woehlk to make a night deposit; the money count on Saturday morning that did not support the claim that the Friday night deposit was made; defendant's conduct in the days after Woehlk's disappearance, including his presence near the death scene; the money orders purchased by defendant; Woehlk's keys found at defendant's home; and defendant's statements to DeLay.

Defendant suggests that the district court erred in placing too much weight on DeLay's testimony. Defendant contends that DeLay's testimony was inherently unreliable because DeLay was a convicted perjurer, because he had given numerous contradictory statements, and because some of his statements could not be corroborated by the physical evidence. Moreover, Delay had psychological problems, and he testified while he was medicated and while he was under the influence of powerful inducements from the government.

Unless clearly contrary to the facts, the determination of credibility lies with the district court. *United States v. Roche*, 321 F.3d 607, 611 (6th Cir. 2003) (citing *Arredondo v. United States*, 178 F.3d 778, 783 (6th Cir. 1999)). We are required to give due regard to the opportunity of the district court to judge the credibility of the witnesses. 18 U.S.C. § 3742(e). Nothing in this record suggests that the district court's reliance on DeLay's testimony was clearly erroneous. The district court was in the best position to judge DeLay's credibility.

Moreover, DeLay's testimony had sufficient indicia of reliability. His original statement to the Tampa police included information that he could only have learned from the murderer, such as the manner, date, and location of Woehlk's death and the location of Woehlk's car. DeLay's recanting of his first statement to the Tampa police at defendant's insistence is consistent with DeLay's testimony that he had no one in his life other than defendant and that defendant was able to impose his will on DeLay.

We conclude that there was sufficient circumstantial evidence to enable the district court to find that Woehlk was murdered and that he was murdered by defendant.

**B.  Harrison Hazzard**

The government presented evidence that, in 1994, Harrison Hazzard lived in the Canton, Ohio, area. Hazzard suffered from cerebral palsy and received SSI benefits. Hazzard's sister, Sherry Beckley, testified that she last spoke to her brother on June 2, 1994. The following day she could not locate him. His apartment manager told her that she had last seen Hazzard on June 3, 1994, in the company of defendant. That was the same day that Hazzard withdrew all of his money from his bank account.

The bank teller who saw Hazzard on June 3, 1994, told Postal Inspector Gregory Duerr that Hazzard told her he was withdrawing all of his savings because he had a friend who was going to help him take care of his finances. According to Duerr, defendant admitted to the Canton police that he had taken Hazzard to the bank on June 3, 1994.

Duerr testified that on June 8, 1994, five days after Hazzard was last seen, the police found defendant in Hazzard's apartment along with Robert Cassidy. Defendant told the police that he was a friend of Hazzard's and that he had Hazzard's permission to be in the apartment. When Duerr interviewed Cassidy a year or two later, Cassidy told him that defendant raped him in Hazzard's apartment on June 8, 1994, and threatened "to put him down like he did the two guys in

Florida."  Cassidy also told Duerr that the previous day, June 7, 1994, defendant had taken Cassidy to an area south of Canton in Ostenburg Township and forced Cassidy to have sex with him.  Human remains were found at this same location on February 23, 1995.  In January 2000, those remains were identified as Hazzard's remains.

DeLay testified that on one occasion while he was living with defendant in Canton, they were driving by a wooded area and defendant wanted to stop and go into the woods.  When DeLay asked why, defendant told him he had killed Hazzard in order to get Hazzard's Social Security checks.

Although there is no direct evidence regarding the cause of Hazzard's death, there was sufficient circumstantial evidence to enable the district court to find that Hazzard was murdered and that he was murdered by defendant.  As the district court noted, defendant was with Hazzard when he withdrew all his money from the bank on the last day he was seen; defendant had a key to Hazzard's apartment and was found in his apartment within days of Hazzard's disappearance; defendant admitted to DeLay that he killed Hazzard; and Hazzard's body was found in the woods where defendant took Cassidy soon after Hazzard's disappearance and where defendant indicated to DeLay he had killed Hazzard.

## C.  Joseph Newman

Joseph Newman was raised in the Canton, Ohio, area.  His family was acquainted with defendant's family.  Newman was disabled and was not employed.  He received SSI benefits and food stamps.  In August 1995, Newman was released from prison.  He lived with his sister until October 1995 when he moved into an apartment several doors down from defendant.

Ethel Newman testified that she last saw her brother Joseph in late October 1995.  The following day she saw defendant removing Newman's belongings from Newman's apartment. The landlord testified that when he went to collect the November rent from Newman on November 1, 1995, no one answered the door.  The landlord filed an eviction action in

late November and recovered the property in early January 1996.  He has not seen or heard from Newman since October 1995.  John Newman testified that he visited his brother at his apartment almost every day in October and that Newman moved out of the apartment because he could not pay the rent. John Newman testified that his brother lived with defendant for two weeks before he disappeared.

A Bank One representative testified that in October 1995 numerous empty envelope deposits were made through the automatic teller machine to Joseph Newman's account. During this time period, no money was deposited into Newman's account, but approximately $4000 was withdrawn. When the bank questioned Newman about his account on October 26, 1995,  Newman claimed he did not make the empty envelope deposits even though the bank's video showed he was present at the time of the transactions.  The bank asked Newman to come back the next day.  Newman did not show up, and no one at the bank ever saw him again. Newman also failed to show up for a scheduled mental health appointment on November 21, 1995.

Ethel Newman and John Newman questioned defendant about their brother's disappearance.  Defendant told them that there was a warrant out for Newman's arrest and that he left town to avoid being arrested.  Defendant told them that he did not know where Newman was but that Newman was doing fine.  Defendant explained that he was cashing Newman's SSI checks for him and putting the money in the mailbox for Newman to retrieve.

Ethel Newman filed a missing person report on her brother in October 1996.  She testified that although Newman had left town in the past, someone always knew where he was.  This time no one had heard from him or knew where he was.  John Miller, a detective with the Canton police department, questioned defendant on October 23, 1996, regarding the missing person report on Joseph Newman.  Defendant told Miller that Newman was hiding from some people. Defendant advised that he had not seen Newman for a year.

He later changed his story to four months, then to two months. Defendant stated that he would receive Newman's checks in the mail, put the check in a plain envelope, and put it back in the mailbox. Sometime in the middle of the night Newman or his designee would come to defendant's home, sign the back of the check, and place the check back in defendant's mailbox. The next day defendant would cash the check, place the cash in the envelope, and put it back in the mailbox for Newman to pick up sometime during the night.

Shortly after defendant was questioned by Detective Miller, defendant cashed Newman's November 1, 1996, SSI check. Although defendant knew about the missing person report, he did not contact the police to advise them that he expected to communicate with Newman regarding the arrival and cashing of the November check.

The operations supervisor of the Akron, Ohio, Social Security Administration office testified that in November 1995, Newman's SSI payment was deposited directly into his bank account. After a telephone contact in November 1995, his next 12 checks, from December 1, 1995 to November 1, 1996, were sent by mail to defendant's residence at 903 5th Street in Canton. The SSI payments were suspended after Newman's sister filed the missing person report. The government's handwriting expert testified that the signatures on the SSI checks were not Newman's signature but tracings of his signature. Newman has never contacted the Social Security Administration to question the suspension of his SSI benefits or to request further benefits.

An administrator of the Stark County Department of Job and Family Services testified that office records indicated that Newman picked up his food stamps in September, October, and finally on November 15, 1995, but that he was never seen after that time. Defendant collected food stamps as representative payee for Joseph Newman in December 1995 and January 1996. Because Newman failed to show for a scheduled interview on January 10, 1996, his food stamp file

was closed and his food stamps were terminated effective January 31, 1996.

Gregory Patton, a Special Agent with the Secret Service, testified that he participated in a search of defendant's residence on May 30, 1997. At that time, defendant corroborated the statement he had previously given to Miller about how he placed Newman's checks in the mailbox. Defendant showed Patton his collection of other mail addressed to Newman. Defendant could not explain to Patton why he did not provide Newman with his other official mail at the same time he was allegedly providing Newman with his SSI checks.

Postal Inspector Duerr testified that numerous personal items belonging to Newman were found during the search of defendant's house. These included Newman's wallet found in defendant's bedroom, which contained Newman's driver's license, fishing license, mental health appointment card, family photographs, and birth certificate. Also found in defendant's bedroom were Newman's mail from the Social Security Administration, Newman's social security card, Newman's court documents, and copies of SSI checks with Newman's signature on them. Duerr also testified that Newman's aunt, Wilma Henry, told him that Newman had complained to her that defendant was taking his money and was trying to get him involved in homosexual activity. Newman told his aunt that if anything happened to him, defendant had killed him.

Defendant presented evidence at the sentencing hearing regarding other possible explanations for Newman's disappearance. John Newman was aware that defendant was associated with a drug dealer. Diane Lewis testified that Newman had lived with her for about a month but that she made him leave the house because he brought prostitutes and drugs into the house. She testified that she heard DeLay threaten Newman's life. She also testified defendant told her that between Thanksgiving and Christmas of 1995, three men came to the house looking for Newman because he owed

them over a thousand dollars for drugs and they said that if they did not get their money something would happen to Newman.

Defendant contends that because Newman's body has not been found, there is no evidence that he died, much less that he was murdered. The district court noted that Newman was living with defendant at the time of his disappearance; that Newman's disappearance coincided with the beginning of defendant's fraudulent endorsement of checks made payable to Newman; and that defendant retained Newman's personal effects. Finally, the district court noted that the completely unbelievable statement defendant gave to investigators about placing Newman's checks in the mailbox "strongly supports an evil understanding of what happened to Newman."

On review, we are satisfied that the evidence was sufficient to enable the district court to find by a preponderance of the evidence that defendant killed Woehlk, Hazzard, and Newman.

### III.

Defendant contends that even if the evidence supported a finding that he killed the three individuals, the district court nevertheless erred in its application of the Sentencing Guidelines. Specifically, he contends that the district court erred in substantially increasing his offense level for a fraud offense based on a finding of murder as part of the relevant conduct and in substantially enhancing his criminal history based upon a finding that he committed murders for which he was not convicted.

The Sentencing Guidelines permit the sentencing court to impose a sentence outside the range established by the applicable guidelines "if the court finds that there exists an aggravating or mitigating circumstance of a kind, or to a degree, not adequately taken into consideration by the Sentencing Commission in formulating the guidelines that should result in a sentence different from that described." U.S.S.G. § 5K2.0 (internal quotation marks omitted). We

review a district court's decision to depart from the Guidelines' sentencing range for abuse of discretion. *United States v. Chance*, 306 F.3d 356, 393 (6th Cir. 2002) (citing *United States v. Barber*, 200 F.3d 908, 911 (6th Cir. 2000)). We will find an abuse of discretion only if we are left with a definite and firm conviction that the court below committed a clear error of judgment. *Id.* (citing *United States v. Guy*, 978 F.2d 934, 939 (6th Cir. 1992)). Whether a stated ground is a permissible basis for departure is a question of law we review de novo. *Id.* (citing *United States v. Sabino*, 274 F.3d 1053, 1078 (6th Cir. 2001)).

A district court's decision to depart from the Guidelines "will in most cases be due substantial deference, for it embodies the traditional exercise of discretion by a sentencing court." *Koon v. United States*, 518 U.S. 81, 98 (1996). Nevertheless, that discretion is guided by certain principles. "Before a departure is permitted, certain aspects of the case must be found unusual enough for it to fall outside the heartland of cases in the Guideline." *Id.* at 95 (quoting *United States v. Rivera*, 994 F.2d 942, 949 (1st Cir. 1993)). The sentencing court should also consider whether a departure based on those features is one that is forbidden, encouraged, or discouraged. *Id.*

### A. Relevant Conduct

Defendant contends that the trial court erred in determining that his murder of Newman was relevant conduct justifying the imposition of an additional thirty-year sentence. The Guidelines provide that the offense level is to be determined on the basis of "all acts and omissions committed . . . or willfully caused by the defendant . . . that occurred during the commission of the offense of conviction, in preparation for that offense, or in the course of attempting to avoid detection or responsibility for that offense." U.S.S.G. § 1B1.3(a)(1). To be considered relevant conduct, it is not necessary that the defendant have been charged or convicted of the particular crime. "Our cases have interpreted the relevant conduct provision of § 1B1.3(a)(2) to include conduct of a criminal

nature for which a defendant could not otherwise be held criminally liable." *United States v. Shafer*, 199 F.3d 826, 830 (6th Cir. 1999) (citing cases).

The district court found that defendant caused Newman's death in order to facilitate the fraud offense. According to the district court, defendant caused the death of Newman "in essence, so that the defendant could receive approximately $300 a month."

The district court's determination that the death of Newman was conduct that occurred during the commission of the fraud offense was not clearly erroneous. This finding is amply supported by the facts surrounding the disappearance of Newman and defendant's forgery of his SSI checks.

Having determined that causing Newman's death was relevant conduct, the district court found that the Sentencing Guidelines concerning the offense conduct do not accurately reflect this conduct. Under the 2000 Sentencing Guidelines Manual, the applicable manual at the time of defendant's sentencing,  the offense level for all three offenses of conviction, mail fraud in violation of 18 U.S.C. § 1341, forgery in violation of 18 U.S.C. § 510, and making false statements in violation of 18 U.S.C. § 1001, was governed by § 2F1.1.[2]  Section 2F1.1 called for a base offense level of 6. The court increased the offense level by 4 points pursuant to § 2F1.1 for specific offense characteristics regarding the amount of the loss and the degree of planning involved. The court added an additional 2 points for vulnerable victim under § 3A1.1(b)(1) and 2 points for obstruction of justice pursuant to § 3C1.1.

The district court determined that this guideline calculation, which resulted in an offense level of 14, did not take into consideration the serious nature of defendant's conduct in causing the death of his fraud victim. The district court

---

[2]Section 2F1.1 was consolidated with § 2B1.1 effective November 1, 2001.

accordingly granted the government's request for an upward departure.

Section 2F1.1, the guideline governing the offenses of conviction, does not factor in the unique circumstances of this case. Causing death is sufficiently outside of the heartland of the fraud, forgery, and false statement offenses to warrant a departure from the Sentencing Guidelines. The Guidelines specifically provide that if death resulted from the relevant offense conduct, the court may increase the sentence above the authorized guideline range. U.S.S.G. § 5K2.1. Thus, we find that the Guidelines encourage departure on this basis. *See also United States v. Jose-Gonzalez*, 291 F.3d 697, 702 (10th Cir. 2002) ("The Guidelines encourage consideration of death and significant physical injury as grounds for departure.").

In fact, under the circumstances of this case, Section 5K2.1 authorizes a "substantial" departure. Section 5K2.1 explains that the extent of the increase should depend on three factors: 1) the dangerousness of the defendant's conduct, 2) the extent to which death or serious injury was intended or knowingly risked, and 3) the extent to which the offense level for the offense of conviction already reflects the risk of personal injury. *Id.*  With respect to the second and third factors, § 5K2.1 specifically notes that "a **substantial** increase may be appropriate if the death was intended or knowingly risked or if the underlying offense was one for which base offense levels do not reflect an allowance for the risk of personal injury, such as fraud." *Id.* (emphasis added). The district court found that death was intended. The Guidelines specifically note that the offense level for fraud does not reflect an allowance for the risk of personal injury. The same is true for the offense levels for defendant's forgery and false statement convictions. Under these circumstances, the Guidelines clearly authorize a substantial increase in the offense level.

In determining the extent of the departure for the relevant conduct of causing the death of Newman, the district court

noted that murder is one of the most serious offenses. First degree murder carries a base offense level of 43, which calls for life imprisonment. U.S.S.G. § 2A1.1. The district court determined that an appropriate adjustment in this case was to increase the offense level of 14 by 23 levels to level 37.

An increase of 23 levels is a significant departure. However, upon careful review we conclude that because defendant's relevant conduct involves the most serious crime of murder and because that conduct was not reflected in the offense level under the Guidelines, the sentencing court's decision to increase the offense level by 23 levels was not unreasonable and was not an abuse of discretion.

## B. Criminal History

Defendant contends that the district court also erred in enhancing his criminal history from category I to category IV based upon murders for which he was not convicted.

Defendant was convicted of unarmed robbery in Ohio in 1968 and served over three years in prison. He was subsequently convicted of grand larceny in Ohio in 1973 and served approximately a year and a half in prison. Because these convictions were over 15 years old at the time of the offense of conviction, they did not count toward defendant's criminal history score. Defendant accordingly had a criminal history level of I. U.S.S.G. § 4A1.2(e)(1). The district court determined that the criminal history category did not adequately reflect the seriousness of defendant's past criminal conduct or the likelihood that he will commit other crimes. Specifically, the district court noted that criminal history category I did not reflect defendant's responsibility for two previous deaths, the death of Woehlk in 1990 and the death of Hazzard in 1994. The district court, citing section 4A1.3 of the Guidelines, departed upward and set defendant's criminal history category at IV.

Section 4A1.3 of the Guidelines provides that if "reliable information indicates that the criminal history category does not adequately reflect the seriousness of the defendant's past

criminal conduct or the likelihood that the defendant will commit other crimes, the court may consider imposing a sentence departing from the otherwise applicable guideline range." U.S.S.G. § 4A1.3.

As we stated in *Barber*, a sentencing departure based upon a finding that the criminal history computation is simply not representative of a defendant's past criminal behavior nor indicative of future unlawful conduct is expressly encouraged by the Sentencing Guidelines. 200 F.3d at 912 (citing *United States v. Pluta*, 144 F.3d 968, 977 (6th Cir. 1998)). Because the basis for the departure by the sentencing court is an encouraged factor under the Guidelines, we review the decision of the trial court to depart for an abuse of discretion. *Barber*, 200 F.3d at 912.

Defendant contends that the evidence regarding his responsibility for the deaths of Woehlk and Hazzard does not meet the "reliable information" requirement of section 4A1.3. We reject this argument because we have already determined above that the evidence was sufficiently reliable to enable the district court to find by a preponderance of the evidence that defendant killed Woehlk and Hazzard. Moreover, it is well established that a sentencing court is not prohibited from considering uncharged criminal conduct. Congress has provided that "[n]o limitation shall be placed on the information concerning the background, character, and conduct of a person convicted of an offense which a court of the United States may receive and consider for the purpose of imposing an appropriate sentence." 18 U.S.C. § 3661. We have previously noted that this statute "was enacted in order to clearly authorize the trial judge to rely upon information of alleged criminal activity for which the defendant had not been prosecuted." *United States v. Silverman*, 976 F.2d 1502, 1512 (1992) (citing 18 U.S.C. § 3577, subsequently renumbered at 18 U.S.C. § 3661).

Defendant also contends the district court should not have considered evidence of the deaths of Woehlk and Hazzard because that evidence does not fall under any of five

examples listed in the guidelines.[3]  The Guidelines clearly provide that the examples are illustrative and are not exhaustive of the information that a district court may consider regarding the adequacy of the criminal history category.  U.S.S.G. § 4A1.3.  Moreover, although defendant's responsibility for the deaths of Woehlk and Hazzard is not similar to the offenses of conviction (fraud, forgery, and false statement), the deaths are similar to the relevant conduct associated with the offenses of conviction, i.e., causing the death of Newman.  The district court found that defendant caused all three deaths for the purpose of promoting his own financial gain.  As the district court noted, defendant had made a career out of living off vulnerable victims.  Section 4A1.3 is broad enough to permit consideration of adult criminal conduct that is similar to the relevant conduct surrounding the offense of conviction, even if it is not similar to the offense of conviction itself.  Information that defendant caused the deaths of two individuals to promote his own financial gain is relevant to defendant's past criminal conduct and to the likelihood that he will commit other crimes.

---

[3] Section 4A1.3 provides that the information the district court may consider regarding the adequacy of the criminal history category may include, but is not limited to, information concerning:

(a) prior sentence(s) not used in computing the criminal history category (e.g., sentences for foreign and tribal offenses);

(b) prior sentence(s) of substantially more than one year imposed as a result of independent crimes committed on different occasions;

(c) prior similar misconduct established by a civil adjudication or by a failure to comply with an administrative order;

(d) whether the defendant was pending trial or sentencing on another charge at the time of the instant offense;

(e) prior similar adult criminal conduct not resulting in a criminal conviction.

U.S.S.G. § 4A1.3.

Finally, defendant contends the district court failed to make specific findings for why it passed over more lenient guideline categories as required by *United States v. Shultz,* 14 F.3d 1093 (6th Cir. 1994).  As we noted in *United States v. Cooper*, 302 F.3d 592 (6th Cir. 2002), sentencing courts must "move stepwise up the ladder" of criminal history categories, and "make specific findings, articulated in language relating to the guidelines, concerning the inadequacy of any sentencing categories passed over." *Id.* at 597-98 (quoting *Shultz*, 14 F.3d at 1102).  We have held that when a sentencing court concludes that departure is proper, it must provide a "specific reason" supporting its decision to depart. *United States v. Thomas*, 24 F.3d 829, 833 (6th Cir. 1994).  This burden is satisfied by a short, reasoned statement from the bench identifying the aggravating factors and the court's reasons for connecting them to permissible grounds for departure.  *Id.* at 833-34 (citing 18 U.S.C. § 3553(c)(2); *United States v. Feinman*, 930 F.2d 495, 501 (6th Cir. 1991)).

Contrary to defendant's assertions, the district court in the instant case did move stepwise up the ladder of criminal history categories and did make specific findings to support the decision to pass over criminal history categories II and III.  The district court  stated that criminal history category II was equivalent, in essence, to one felony conviction, which was obviously inadequate to reflect defendant's past criminal conduct.  The district court stated that although two deaths could result in six points which would be covered by category III, category III would understate the seriousness of the risk defendant posed to the public.  The district court specifically found that, if released from prison, defendant would likely continue to prey on vulnerable victims.  Based upon this finding, the district court concluded that criminal history category III did not appropriately reflect the seriousness of the threat defendant posed to the public.  In summary, the district court determined that the uncharged conduct involving the two murders contributed at least six points, and that the threat defendant posed to the public put him at a higher level which brought him to criminal history category IV.

The district court offered a reasoned opinion explaining why he placed defendant at criminal history category IV. The district court's analysis does not represent an abuse of discretion.

## C.  Reasonableness

After determining that an upward departure was not based on impermissible factors, we are still required under 18 U.S.C. § 3742(e)(3) and 18 U.S.C. § 3742(f) to review any sentence that is outside the applicable guideline range for reasonableness.  *Chance*, 306 F.3d at 397.

> The reasonableness determination looks to the amount and extent of the departure in light of the grounds for departing.   In assessing reasonableness under § 3742(f)(2), the Act directs a court of appeals to examine the factors to be considered in imposing a sentence under the Guidelines, as well as the district court's stated reasons for the imposition of the particular sentence.

*Id.* The sentencing court should be guided by the structure of the Guidelines in determining the extent of any departure. *United States v. Crouse*, 145 F.3d 786, 792 (6th Cir. 1998).

In determining the extent of its departure as to defendant's offense level and criminal history category, the district court applied the most closely analogous Guideline provisions. These levels result in a Guidelines range of 292 to 365 months.  The 360-month sentence imposed by the district court is within the statutory maximum if the sentences for each count run consecutively.  The Sentencing Guidelines provide for consecutive sentencing where necessary to produce a combined sentence equal to the total guideline punishment:

> If the sentence imposed on the count carrying the highest statutory maximum is less than the total punishment, then the sentence imposed on one or more of the other counts shall run consecutively, but only to the extent necessary to produce a combined sentence equal to the total punishment. In all other respects, sentences on all counts shall run concurrently, except to the extent otherwise required by law.

U.S.S.G. § 5G1.2(d).

The sentence imposed in this case far exceeds the sentence that would have been imposed in the absence of any departures. The evidence at sentencing established, however, that defendant killed Newman in order to gain control over his SSI checks and that defendant had a history of two prior murders relating to thefts of money from his murder victims. This conduct was not reflected in the original guideline calculation.  Given the fact that defendant's relevant offense conduct and uncharged criminal history involve the most serious criminal behavior, we cannot say that the ultimate sentence was unreasonable.  Accordingly, we conclude that the district court did not abuse its discretion in imposing a sentence of 360 months of imprisonment.

## IV.

For the foregoing reasons we AFFIRM the sentence imposed.