[DO NOT PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

FILED

U.S. COURT OF APPEALS
ELEVENTH CIRCUIT
October 11, 2005
THOMAS K. KAHN
CLERK

_____

No. 04-12668

_____

D. C. Docket No. 03-10021-CR-SH

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

versus

JONATHAN LEE VERNIER,

Defendant-Appellant.

_____

Appeal from the United States District Court
for the Southern District of Florida

_____

**(October 11, 2005)**

Before BARKETT and MARCUS, Circuit Judges, and GEORGE[*], District Judge.

PER CURIAM:

---

[*]Honorable Lloyd D. George, United States District Judge for the District of Nevada, sitting by designation.

Jonathan Lee Vernier appeals his 210-month sentence and $70,296.52 restitution order imposed after pleading guilty to: (1) the knowing and unauthorized use of one or more unauthorized access devices (a credit card) issued to another person in order to withdraw $4,928, in violation of 18 U.S.C. § 1029(a)(2) (Count 1); and (2) the transportation of more than $5,000 of stolen property (jewelry) in interstate commerce, in violation of 18 U.S.C. § 2314 (Count 2).

On appeal, Vernier argues that the sentence must be vacated because (1) the district court was "unalterably predisposed toward a particular punishment," United States v. Greenman, 700 F.2d 1377, 1379 (11th Cir. 1983), in violation of the Defendant's due process rights; (2) the district court erred as a matter of law in granting an upward departure under U.S.S.G. § 5K2.1; (3) the district court's sentence amounted to plain error under the line of Supreme Court cases culminating in United States v. Booker, 543 U.S. ___, 125 S. Ct. 738, 160 L. Ed. 2d 621 (2005); and (4) the district court's restitution order was invalid. After thorough review, we affirm the sentence in all respects except for the order of restitution.

## I. Background

### A. The Guilty Plea

On January 16, 2004, pursuant to a detailed written plea agreement and a stipulated set of facts, Vernier pled guilty to Counts 1 and 2 of a five-count indictment. The agreement provided that (1) the government would dismiss the remaining three courts of the indictment after sentencing;[1] (2) that the loss involved in the relevant conduct was more than $120,000 and less than $200,000 for purposes of U.S.S.G. § 2B1.1(b)(1), and, accordingly, that a ten-level "loss" enhancement was warranted; and (3) that the offenses embodied in Counts 1 and 2 involved theft from the person of another (Ran Mesika) for purposes of U.S.S.G. § 2B1.1(b)(3), and therefore, an additional two-level enhancement was warranted.

The parties also agreed and stipulated to the following basic facts. On April 12, 2003, Ran Mesika, a twenty-two year old Israeli, left San Diego in his 1991 Ford Econoline van. Mesika's van contained $123,430.75 worth of jewelry that had been consigned to him by a jewelry company. Mesika intended to sell the jewelry as he traveled across the country. Mesika also possessed a Visa credit card issued by an Israeli credit card company.

Prior to May 1, 2003, Mesika met the Defendant and offered him a ride. By the early morning of May 1st, the two men arrived in Lake Charles, Louisiana.

---

[1]Vernier was also indicted for interstate transportation of a motor vehicle owned by another, in violation of 18 U.S.C. § 2312 (Count 3); and the assault of two FBI agents during the course of their official duties, in violation of 18 U.S.C. § 111(a) (Counts 4 and 5).

Sometime before 9:48 a.m., the Defendant "took possession, custody, and control of the subject van and subject jewelry from Mesika without Mesika's voluntary consent, authorization or approval, that is, the subject van and subject jewelry were stolen from Mesika by Vernier."

Besides the van and jewelry, the Defendant also "took possession, custody, and control" of Mesika's credit card. At about 9:48 a.m. on May 1st, the Defendant unsuccessfully attempted a $200 cash advance withdrawal from an ATM machine at a truck stop in Louisiana using Mesika's credit card. Vernier made a second attempt two minutes later and successfully withdrew $200, and then made a third successful withdrawal at 9:52 a.m.

Between May 2nd and May 5th, Vernier made some forty-six cash advance withdrawals using Mesika's credit card in Louisiana, Mississippi, Alabama, and Florida, totaling about $4,928.00. On May 13, 2003, the Defendant was spotted by law enforcement agents leaving a campsite in Key West, Florida. Mesika's van was found at the campsite. Vernier was arrested and the van was searched. It contained "thousands of pieces of the subject jewelry." Finally, the parties stipulated that the jewelry had traveled in interstate commerce prior to May 13th.

B. The Presentence Investigation Report

The Presentence Investigation Report ("PSI") detailed the stipulated facts,

4

adding some additional details including the circumstances surrounding the Defendant's arrest and Mesika's disappearance.

Among other things, the PSI recounted that law enforcement discovered that Vernier had used the name "Ran Mesika" when he registered at the Key West campsite, that Vernier had called himself "Trouble," and that the Defendant told a woman that Mesika's van was his and that he was a jewelry salesman.

When federal law enforcement agents identified themselves to Vernier, the Defendant pushed the agents away and fled on foot. Along the way, Vernier pushed a woman off a motor scooter, seized it and drove it through the streets of Key West as the agents pursued him. Soon thereafter, Vernier dove in the water, swam to another location, pushed another woman off a bicycle, which he used to flee, and was ultimately apprehended.

A subsequent search of the van and campsite revealed, among other things, the consigned jewelry and a plastic tarp, which was placed over the rear of Mesika's van, concealing the California license plate. Agents also located DNA evidence on a tire iron and a camera tripod, and found blood stains throughout the van, including on the van's carpet, and blood splatter on the windows and a light fixture in the rear of the van. The DNA found at the scene and in the van matched Mesika's DNA. DNA evidence also excluded the Defendant as a source of the

DNA found on the blood stained items seized in the van.

Based on this fact pattern, the PSI grouped Counts 1 and 2, and set the Defendant's base offense level at six, pursuant to U.S.S.G. § 2B1.1(a)(2). The PSI also increased the base offense level by ten levels based on the "loss" amount agreed to by the parties, pursuant to U.S.S.G. § 2B1.1(b)(1)(F), and by an additional two levels, again based on the stipulated facts, because the offense involved theft from another, pursuant to U.S.S.G. § 2B1.1(b)(3). Pursuant to U.S.S.G. § 3C1.2, the PSI also recommended another two-level increase, based on the Defendant's reckless creation of a substantial risk of death or serious bodily injury during the course of his flight from law enforcement officers in Key West. The Defendant's timely acceptance of responsibility yielded a three-level reduction, pursuant to U.S.S.G. § 3E1.1, and a total offense level of seventeen.

The Defendant's very extensive criminal history resulted in twelve criminal history points. Two additional points were added because Vernier committed the charged offenses after having escaped from a Colorado jail in April 2003 while serving a term of imprisonment, and one more point was added since he committed the charged offenses less than two years after escaping from prison. As a consequence, Vernier was given a Criminal History Category of VI yielding a presumptive guideline range of fifty-one to sixty-three months imprisonment.

6

Finally, the PSI noted three possible grounds for upward departure and observed that the government intended to seek a § 5K2.1 upward departure specifically because the Defendant intended or knowingly caused Mesika's death or serious bodily injury.

The Defendant filed written objections to the PSI seeking, among other things, the elimination of Paragraphs 18 and 19 from the PSI, which outlined the DNA testing results and the disappearance of Mesika, on the grounds that the information was "not relevant" to the charges the Defendant pled guilty to. The Defendant added that this was not a death case, and there was no evidence of Mesika's death or of the Defendant's responsibility for it, observing that the lack of knowledge of Mesika's whereabouts was an insufficient foundation to establish a basis for departure. The Defendant also challenged the proposed two-level increase, pursuant to § 3C1.2, and portions of the restitution section of the PSI, contesting among other things, the value of the stolen jewelry included because it had been recovered.

The government, in turn, responded to the Defendant's objections, and moved for a fifteen-level upward departure, pursuant to § 5K2.1, contending that Vernier caused the death of Mesika in the course of committing the charged crimes. The government detailed the legal basis for the departure and outlined the

7

evidence it intended to adduce at the sentencing hearing in order to establish that Mesika was dead and Vernier was responsible.

## C. The Sentencing Hearing

Vernier's sentencing hearing took place on May 10, 2004, at which time the district court took testimony presented by the government on the issues surrounding Mesika's purported death and the Defendant's flight. Again the Defendant objected on the grounds that the government had improvidently turned the sentencing hearing into a murder trial when, in fact, it properly concerned only the interstate transportation of stolen property and the improper use of an access device. The Defendant added that the proposed testimony would "poison the well" and improperly prejudice the court.

The district court summarily overruled the Defendant's objections, said that it would entertain no further argument, and allowed the government to present the testimony of four FBI agents and Mesika's father. Among other things, the testimony established that the Defendant and Mesika were captured on video surveillance tapes taken at a Wal-Mart store in North Lake Charles, Louisiana, depicting them together at 4:19 a.m. on May 2, 2003. The tapes also showed Vernier re-entering the Wal-Mart alone around 6:40 a.m. Still other video surveillance tapes taken from an ATM at a truck stop that same morning, on May

2nd, showed Vernier alone, using Mesika's credit card. Those tapes also revealed Mesika's van in the parking lot and then driving away after Vernier finished his credit card transaction.

Mesika's cellular telephone records were also introduced, which established phone calls made between midnight and 3:00 a.m. on May 2nd, originating in Texas, and calls made between 3:00 and 4:00 a.m. in Louisiana. No phone calls were made or received on Mesika's cellular phone after 7:00 p.m. that day.

Inside Mesika's van, located at the Key West campsite, the agents found a rug cleaner, a plastic cleaner, a scrub brush, and air freshener. They also discovered that the van's rug and walls had just been scrubbed clean. Nevertheless, the agents found blood, and blood splatter, throughout the van, including on the passenger-side rear window, the overhead light, and the door jam. The agents also found a tire iron and rope in the back of the van. The tire iron, which was discovered underneath a suitcase containing the stolen jewelry, had visible human tissue and blood residue on it. As noted, DNA testing determined Mesika to be the source of the blood and the human tissue.

Finally, Mesika's father, an Israeli citizen, testified that he had spoken with his son, Ran Mesika, every day by cell phone prior to May 2, 2003, but that he has not heard from his son since that date. He also testified that his son generally slept

in the van to save money. Moreover, according to the testimony of an FBI agent, Mesika's van contained a folding metal bedframe and a friend of Mesika's had informed him that the bedframe contained a mattress when Mesika left San Diego. When the van was searched, however, it contained only the metal bedframe.

Vernier's counsel cross-examined the government's witnesses, but presented no witnesses or evidence on the Defendant's behalf, although afforded the opportunity to do so by the district court, and did not dispute the government's evidence.

Although the district court initially said that it would not entertain any legal argument, it permitted both sides to argue after the factual presentation. The government urged the court to depart upward based on § 5K2.1, asserting that the Defendant was responsible for Mesika's violent death and that only a fifteen-level departure was reasonable under the circumstances.

The defense responded that the alleged murder of Mesika was legally irrelevant to the charges, that a § 5K2.1 upward departure was legally preempted by U.S.S.G. § 2B1.1(b)(11) (§ 2B1.1(b)(12) in the most recent version of the Guidelines), which provided for a two-level increase in cases where the offense involved the conscious or reckless risk of death or serious bodily injury, and that, in any event, evidence of Mesika's death was speculative in the absence of finding

10

the body.

The district court further allowed the Defendant ten days to file any memoranda or motion "relevant to the upward departure," but declared that it had determined to grant the government's motion for an upward departure under § 5K2.1. More precisely, the court overruled Vernier's objections to the PSI, granted the government's motion for a fifteen-level upward departure, departed from a base offense level of 17 to a level 32, and sentenced Vernier to a total of 210 months of imprisonment (105 months on each of Counts 1 and 2), three years of supervised release, and $70,296.52 in restitution. The district court also stated its intention to file an order memorializing its rationale for the departure.[2] Notably, the Defendant

---

[2]The district court observed:

> Well, to all who are present here, whether you understand everything that has gone on here today or not is not really relevant. But I think it only fair to point out, because counsel has heard me say this to jurors, I don't know how many times, and essentially it is this.
>
> Evidence in a matter of this nature may be presented by what we call either direct or circumstantial evidence. I have further advised those jurors that the law makes no distinction nor limitation upon the weight that you the finder of the facts may give to either direct or circumstantial evidence.
>
> Today I sit as the tr[i]er of the facts as well as the arbiter of the law for purposes of this proceeding.
>
> I do not mind, as a matter of fact I think I would be derelict if I failed to make certain observations.
>
> I am intellectually of the firm conviction that Ran Mesika is indeed deceased and that the defendant was aware of this fact at the times and

11

did not raise a constitutional challenge to the Guideline sentence, nor did he object to the way the district court conducted the sentencing hearing.

Within the ten day period, Vernier filed a written response to the government's motion for an upward departure, again arguing that a § 5K2.1 departure was legally preempted by § 2B1.1(b)(11), that his case could not fall outside the "heartland" of § 2B1.1 cases as a matter of law, and that the departure

dates he was using the victim's ATM card.

What are some of those circumstances that influenced this Court, and, I am sure, would influence jurors?

Here we have an acknowledged meeting, one mentioned over a phone to among others the father of the victim. And then we have a complete cut off.

But then we have conduct of this nature. The use of an ATM card by the perpetrator knowing full well that he did not have to be worried about someone reporting the loss of that ATM card and thereby immediately setting up alerts that could be placed in those ATM machines.

This is without question the most powerful circumstantial case of conduct by this defendant that I have ever witnessed either as the tr[i]er of fact or before a jury.

I had no hesitancy in making the decision that I have made for, I repeat, that I am now both intellectually and professionally convinced that Ran Mesika is indeed deceased and indeed that this defendant was aware of it because of his deeds.

As the Court has indicated, the Court agrees with the analysis of the government's in the government's request and motion for an upward departure. As I have already stated this Court has determined prior to even reviewing that motion that this Court would indeed depart[].

12

was inappropriate, in any case, because there was insufficient proof that Mesika was actually dead. Vernier then timely filed a notice of appeal. After Vernier filed his initial brief with this Court, the district court, on September 17, 2004, entered an order memorializing its reasons for granting the § 5K2.1 departure. The Defendant objected to the order asserting that the district court lost jurisdiction in light of the pending appeal.

## II. Discussion

A.

The Defendant first argues that we should reverse his sentence and remand for re-sentencing before another district judge because the court harbored a pervasive bias against him and was unalterably disposed to a particular punishment. We are not persuaded.

We observe at the outset that the Defendant did not object during or after the sentencing proceeding to the court's alleged bias. In the absence of preserving the issue of bias, we will generally refuse to entertain it on appeal absent a showing of fundamental error. United States v. Ramos, 933 F.2d 968, 974 (11th Cir. 1991). Fundamental error may be found, however, where the judge's remarks and conduct evince pervasive bias and prejudice that unfairly prejudices the defendant. Id. at 973-74.

13

We add that judicial remarks critical of a party will not generally support a claim of partiality or bias. As the Supreme Court has observed, "[d]isinterestedness does not mean child-like innocence." Liteky v. United States, 510 U.S. 540, 551, 114 S. Ct. 1147, 1155, 127 L. Ed. 2d 474 (1994). When examining the totality of the record, we are required to ask whether the judge's remarks reveal so "high degree of favoritism or antagonism as to make fair judgment impossible." Id. at 555, 114 S. Ct. at 1157.

When this record is viewed as a whole we are satisfied that the district court's conduct during the sentencing hearing does not establish pervasive bias against Vernier rendering fair and impartial judgment impossible. While some of the district court's comments were plainly infelicitous, they do not evince legal bias. Without question, the district court conducted the sentencing hearing in a blunt and forceful manner. Nevertheless, the district court received and reviewed the Defendant's written objections to the PSI, gave the Defendant the opportunity to confront, cross-examine, and rebut the government's evidence and witnesses presented at the sentencing hearing, in fact allowed the defense to argue both the facts and the law at the hearing, and provided the Defendant with the opportunity to brief the matter of departure further.

The fact that the district court bluntly announced its intention to depart at the

14

outset of the hearing does not evince a deep-seated bais or an unalterable predisposition. Indeed, our law is well-settled that a district court must advise the parties prior to the sentencing hearing of its intention to depart from the guideline range. See, e.g., Burns v. United States, 501 U.S. 129, 138-39, 111 S. Ct. 2182, 2187, 115 L. Ed. 2d 123 (1991). In this case, the district court plainly put the government to its burden of establishing the factual bases for the departure. Moreover, Vernier's basic argument that the alleged murder arising out of the charged conduct was legally irrelevant was undeniably without merit, see U.S.S.G. § 1B1.3 (stating that relevant conduct for purposes of determining a defendant's guideline range includes "all acts and omissions committed, aided, abetted, counseled, commanded, induced, procured, or willfully caused"), and the district court was not obliged to comment at length about it. Nor, finally, taken as a whole, can we discern on the record, a violation of Rule 32 of the Federal Rules of Criminal Procedure.

B.

Vernier also argues that the district court erred in departing upward based on § 5K2.1 because (1) the court had no jurisdiction to enter a supplemental order on September 14th memorializing its reasons for granting the departure; (2) the court did not make adequate findings that Mesika's death resulted from the Defendant's

conduct; (3) the court failed to recognize that in this case § 2B1.1 takes death into account, preempting a § 5K2.1 departure; and (4) the extent of the upward departure was unlawful because the court did not consider the factors outlined in the commentary to § 5K2.1. We remain unconvinced.

As a threshold matter, we must decide whether to measure the lawfulness of the district court's § 5K2.1 departure in light of its September 17, 2004 order, or only in light of the record developed prior to Vernier having filed his notice of appeal. The issue turns on whether the district court had jurisdiction to enter the September 17th order after it entered judgment and the Defendant filed his notice of appeal.

The filing of a notice of appeal will generally divest the district court of jurisdiction over the matters at issue in the appeal, except to the extent that the court must act "in aid of the appeal." Shewchun v. United States, 797 F.2d 941, 942 (11th Cir. 1986). Plainly, the district court had been divested of jurisdiction to act other than "in aid of the appeal" when it entered its September 17th order. We hold that in this case, however, the supplemental order was a permissible act in aid of appeal precisely because it facilitated, rather than interfered with the review of the appeal. The district court intended all along to file a written order detailing its rationale for the upward departure. The order did no more than that. In fact, the

September 17th order in no way modified the district court's sentence or altered the foundation upon which it rested. It did not amount to a re-sentencing of the Defendant. Rather, the district court's reduction of its oral findings to writing after the filing of a notice of appeal was within its jurisdiction because it would aid the appellate court in its review. See, e.g., United States v. Nichols, 56 F.3d 403 (2d Cir. 1995).

Nor are we persuaded by Vernier's suggestion that the district court failed to make adequate findings. Defendant's argument that the district court was deficient in its findings rests on the language in § 5K2.1 that,

> [t]he sentencing judge must give consideration to matters that would normally distinguish among levels of homicide, such as the defendant's state of mind and the degree of planning or preparation. Other appropriate factors are whether multiple deaths resulted, and the means by which life was taken. The extent of the increase should depend on the dangerousness of the defendant's conduct, the extent to which death or serious injury was intended or knowingly risked, and the extent to which the offense level for the offense of conviction . . . already reflects the risk of personal injury.

U.S.S.G. § 5K2.1.

The district court expressly took note of these requirements in its September 17th order. It then proceeded to make numerous findings exhibiting compliance with the Guidelines. In particular, the district court found that,

> Vernier . . . had the motive and opportunity to murder Mesika by taking advantage of his close relationship to the victim to gain

financially by the fraudulent use of Mesika's credit card after his death. . . . Vernier [also] attempted to cover up the scene of his death. The cleaning agents and water and blood stains (belonging to Mesika) show that Vernier attempted to hide the murder scene and evade punishment for the heinous crimes he committed.

These findings say that Defendant murdered Mesika intentionally as evident from the financial gain Defendant reaped and from Defendant's calculated effort to conceal Mesika's death. As well, they suggest that the Defendant planned the murder in the course of cultivating a relationship with Mesika. Finally, the district court suggested in calling Defendant's crimes "heinous," that Defendant took Mesika's life in a brutal fashion. In short, we are satisfied that the district court followed the guidance provided in the commentaries to § 5K2.1 in determining the extent of an upward departure.

We are also unconvicned by Vernier's argument that § 2B1.1 already takes death into account, preempting as a matter of law a § 5K2.1 departure. Section 2B1.1(b)(11) of the Guidelines specifically provides for a two-level increase in the base offense level "[i]f the offense involved [] the conscious or reckless risk of death or serious bodily injury." That provision applies, however, only where the defendant's offense conduct intrinsically carries the conscious or reckless risk of death or injury. In this case, Vernier's offense conduct -- driving a van across state lines with stolen jewelry, and using a third person's credit card without

18

authorization -- carries <u>no</u> inherent risk of death or serious bodily injury. This case is nothing like <u>United States v. Snyder</u>, 291 F.3d 1291, 1294-95 (11th Cir. 2002), where the § 2B1.1 provision applied to conduct involving false certifications to the FDA concerning the effectiveness of a cancer drug, precisely because the underlying conduct inherently carried a risk of death or serious injury to clinical-trial volunteers. <u>See also</u> <u>United States v. Lucien</u>, 347 F.3d 45, 55-57 (2d Cir. 2003) (applying § 2B1.1(b)(11) to fraud convictions involving fabricated automobile collisions, conduct inherently carrying risk of death or serious injury).

C.

Vernier also argues, for the first time on appeal that his sentence must be reversed because it was imposed on the basis of facts neither charged in the indictment, nor found by the jury, in violation of the Fifth and Sixth Amendments, and the Supreme Court's rulings in <u>Apprendi v. New Jersey</u>, 530 U.S. 466, 120 S. Ct. 2348, 147 L. Ed. 2d 435 (2000), <u>Blakely v. Washington</u>, 542 U.S. 296, 124 S. Ct. 2531, 159 L. Ed. 2d 403 (2004), and <u>United States v. Booker</u>, 543 U.S. ___, 125 S. Ct. 738, 160 L. Ed. 2d 621 (2005).

Where, as here, a defendant raises a <u>Booker</u> claim for the first time on appeal, we review the matter only for plain error. <u>United States v. Rodriguez</u>, 398 F.3d 1291, 1298 (11th Cir. 2005); <u>see also</u> Fed. R. Crim. P. 52(b). Under this

19

standard of review, "[a]n appellate court may not correct an error the defendant failed to raise in the district court unless there is: '(1) error, (2) that is plain, and (3) that affects substantial rights,'" and even then, the appellate court has the discretion to address the error only if "'(4) the error seriously affects the fairness, integrity, or public reputation of judicial proceedings.'" Rodriguez, 398 F.3d at 1298 (quoting United States v. Cotton, 535 U.S. 625, 631, 122 S. Ct. 1781, 1785, 152 L. Ed. 2d 860 (2002)).

As we recently observed:

> Under United States v. Booker, there are two kinds of sentencing errors: one is constitutional and the other is statutory. "[T]he Sixth Amendment right to trial by jury is violated where under a mandatory guidelines system a sentence is increased because of an enhancement based on facts found by the judge that were neither admitted by the defendant nor found by the jury." United States v. Rodriguez, 398 F.3d 1291, 1297 (11th Cir. 2005). In addition, "[a]s a result of Booker's remedial holding, Booker error exists when the district court misapplies the Guidelines by considering them as binding as opposed to advisory." United States v. Shelton, 400 F.3d 1325, 1330-31 (11th Cir. 2005).

United States v. Cartwright, 413 F.3d 1295, 1300 (11th Cir. 2005).

Vernier suggests that the district court committed Booker error with respect to certain enhancements and findings contributing to the Defendant's sentence -- including a finding of fifteen criminal history points and a Criminal History Category VI, a ten-level enhancement for a loss in the amount of $128,791.82,

pursuant to U.S.S.G. § 2B1.1(b)(1)(F), a two-level enhancement for theft from the person of another, pursuant to U.S.S.G. § 2B1.1(b)(3), a two-level increase for reckless endangerment during flight, pursuant to U.S.S.G. § 3C1.2, and an order of restitution, pursuant to the Mandatory Victims Restitution Act ("MVRA"), 18 U.S.C. §§ 3663A-3664. We are unpersuaded.

First, as for the Defendant's criminal history, we have consistently rejected any claim that the district court erred when it enhanced a sentence based on prior convictions. The Supreme Court has consistently rejected the argument that a district court commits error when it considers prior convictions in sentencing a defendant under the Guidelines. See, e.g., Almendarez-Torres v. United States, 523 U.S. 224, 118 S. Ct. 1219, 140 L. Ed. 2d 350 (1998); United States v. Marseille, 377 F.3d 1249, 1257 (11th Cir. 2004); accord United States v. Orduno-Mireles, 405 F.3d 960, 963 (11th Cir. 2005); Shelton, 400 F.3d at 1329.

Second, the ten-level enhancement for loss in an amount exceeding $120,000, and the two-level enhancement for theft from the person of another, were not the result of judicial fact-finding, but rather were facts unambiguously admitted by Vernier as part of the plea agreement. Accordingly, no constitutional or statutory Booker error can be attributed to those enhancements. See Cartwright, 413 F.3d at 1300; Shelton, 400 F.3d at 1330.

21

Thus, the only sentencing enhancement not admitted to by Vernier but unambiguously found by the district court was for reckless endangerment during flight. As for this two-level enhancement, the Defendant showed that the error was "plain" since "it is enough that the error be 'plain' at the time of appellate consideration." Rodriguez, 398 F.3d at 1299 (quoting Johnson v. United States, 520 U.S. 461, 468, 117 S. Ct. 1544, 1549, 137 L. Ed. 2d 718 (1997)).

It is the third prong of the plain error standard that defeats the vast majority of unsuccessful Booker claims, and this case is no exception. It requires that a defendant show "there is a reasonable probability of a different result if the guidelines had been applied in an advisory instead of binding fashion by the sentencing judge in [the] case." Id. at 1301. A "reasonable probability," we described, "means a probability 'sufficient to undermine confidence in the outcome.'" Id. at 1299 (quoting United States v. Dominguez Benitez, 542 U.S. 74, 124 S. Ct. 2333, 2340, 159 L. Ed. 2d 157 (2004) (citation omitted)). Nothing in the record indicates that the district court would have imposed a different sentence if it had known the Guidelines were not mandatory. To the contrary, the trial judge could not have been more emphatic that his sense of justice and responsibility as much propelled the enhancements of Defendant's sentence as the mandatory nature of the Guidelines. In short, we cannot say that the outcome would have been

different if the district court had known that increasing Defendant's sentence based on aggravating factors was not mandatory. Accordingly, Defendant's Booker claim must fail.

Third, we consider the district court's fifteen-level upward departure under § 5K2.1. Section 5K2.1 provides that "[i]f death resulted, the court may increase the sentence above the authorized guideline range." (Emphasis added). Whether exercise of a court's discretion to depart upward is a decision made under a "mandatory Guidelines regime," as needed for Booker error, is a matter of some uncertainty. Compare United States v. May, 413 F.3d 841, 848 (8th Cir. 2005) (stating that it is "unclear" whether a departure within the district court's discretion is Booker error), with United States v. Cunningham, 405 F.3d 497, 504 (7th Cir. 2005) ("To the extent that [defendant] argues that the court's upward departure [not mandated by the guidelines] violates the Sixth amendment, he is correct."). This Circuit has yet to squarely address whether discretionary departures may even constitute Booker error. This case will not be our first foray into that debate.

Even if the Defendant could establish that the district court's upward departure somehow amounted to Booker error, and that the error was plain, in satisfaction of the first two prongs of the plain error standard, Vernier would fail still again because he cannot show that the error affected his substantial rights. As

23

with the Defendant's other claims, there is not the slightest indication in this record that the district court would have sentenced the Defendant differently even if it were operating under a purely advisory sentencing guideline regime.

Finally, we consider the district court's order to pay restitution under § 3663A of the MVRA. Recently, we observed that neither this Court nor the Supreme Court has addressed whether Booker applies to restitution orders and other circuits are split on the question. United States v. King, 414 F.3d 1329, 1330 (11th Cir. 2005). Thus, even if a court's restitution order constituted Booker error, that error was not "plain." Id. Defendant's argument cannot succeed for this reason.

Defendant also argues that the district court had no authority to order restitution for the value of stolen jewelry, which the government recovered, without determining that returning the jewelry was "impossible, impractical, or inadequate," as required by the MVRA. 18 U.S.C. § 3663A(b). The government concedes that in this respect, it has not met its burden of proof under 18 U.S.C. § 3664A(e). We agree. Accordingly, we remand to the district court the issue of determining whether Defendant must make restitution for the value of the stolen jewelry.

## III. Conclusion

In short, we AFFIRM the sentence in all respects except for the order of restitution, which we VACATE and REMAND to the district court for further proceedings consistent with this opinion.

**AFFIRMED IN PART, VACATED AND REMANDED IN PART.**