**UNITED STATES of America**

v.

**Jonathan Lee VERNIER, Defendant.**

**No. 03–10021CR.**

United States District Court,
S.D. Florida.

Sept. 17, 2004.

Stewart Abrams, Asst. Fed. Public Defender, Federal Public Defenders Office, Miami, FL, for Defendants.

## *ORDER*

HIGHSMITH, District Judge.

This cause is before this Court upon the United States of America's Motion for Upward Departure in the sentencing of Defendant Jonathan Vernier ("Vernier")(DE # 30). This Court views this case as falling outside the heartland of cases under the applicable sentencing guidelines due to this Court's finding of intentional infliction of serious injury and death to the victim, Ran Mesika ("Mesika"), and therefore GRANTS the government's motion for upward departure.

## FACTUAL BACKGROUND

On or around April 12, 2003, Ran Mesika, a twenty-two-year-old Israeli citizen visiting family in the United States, left from San Diego, California in a blue 1991 Ford van carrying about $123,403 worth of jewelry he planned to sell as he drove across the country. Mesika maintained constant contact with his family and friends by cellphone throughout his travels. On April 30, Mesika informed a friend that he had picked up a hitchhiker, Jonathan Vernier about two days prior. Unbeknownst to Mesika, Vernier had escaped from a Colorado state prison and had a history of criminal convictions. Mesika was last seen on a surveillance tape with Vernier in a Lake Charles, Louisiana Wal-Mart in the early morning hours of May 2, 2003. Mesika's last contact with his family and friends was a call to his parents in Israel that morning. Mesika has not been seen or heard from since.

Vernier has admitted that on May 2, 2003 "before 9:48 AM, he took possession,

Charles Duross, Asst. U.S. Atty., Miami, FL, for Plaintiffs.

custody, and control of the subject van and subject jewelry from Mesika without Mesika's voluntary consent, authorization, or approval, that is, the subject van and subject jewelry were stolen from Mesika by Vernier." (DE # 24–1 at ¶ 3). Between May 2nd and May 12th, Vernier made 49 cash withdrawal attempts with Mesika's credit card, 27 of which were successful, allowing Vernier to withdraw a total of $4,928. Vernier sometimes made a series of withdrawals and attempted withdrawals within minutes of one another, either at the same ATM or different ATMs in the same area.

Vernier continued using Mesika's credit card to make cash withdrawals as he drove through Louisiana, Mississippi, Alabama, and Florida in Mesika's van. Video surveillance cameras captured images of Vernier and the van but never of Mesika. As Vernier traveled, he identified himself as "Ran Mesika." He used Mesika's passport to check into a hotel, he used Mesika's name when buying a cellphone at Radio Shack, and he used Mesika's name when renting camping space in Key West, Florida where he was finally apprehended by FBI special agents and local law enforcement.

When confronted by FBI agents in Key West, Vernier fled on foot, leading the agents on a chase before being apprehended. During the course of the chase Vernier abandoned his wallet, cellphone, shoes, and shirt. He also stole a motor scooter and a bicycle, risking serious injury to both of the owners when he pushed them to the ground. After his arrest, Vernier refused to identify himself, and would only say that his name was "Trouble" and that he was the one law enforcement was looking for (DE # 30 at p. 5).

Law enforcement officers conducted a search of Mesika's van, which was parked at the campsite with a plastic tarp covering the license plate. They observed that the mattress Mesika had used as a couch and bed had been removed from the back of the van. Law enforcement also noticed that the van had recently been cleaned. Cleaning agents, a scrub brush, and air freshener were found in the van along with water stains and new rust. A forensic examination revealed the presence of blood throughout the back of the van. Blood stains were found on the carpet, and Mesika's blood and tissue was found on a tire iron inside the van. Blood spatter was found on the inside of the rear windows, on a light fixture on the roof of the rear of the van, and on the door frame in the rear of the van. Deoxyribonucleic acid (DNA) testing identified the blood as belonging to Ran Mesika.

Vernier has pled guilty to two counts: Title 18 U.S.C. § 1029(a)(2) for the fraudulent withdrawal of money from Mesika's credit card, and § 2314 for the interstate transportation of stolen goods and money. Both counts are found in United States Sentencing Guideline § 2B1.1. Under this guideline, Vernier would normally be sentenced for an offense level of 17 and receive 51 to 63 months imprisonment.

## DISCUSSION

Taking into account Mesika's disappearance, the identification of his blood in the stolen van, and other circumstances of the case, this Court finds the evidence sufficient that Vernier was responsible for Mesika's death and grants the government's motion for upward departure, bringing Vernier's offense level to 32, resulting in an imprisonment range of 210—240 months. This departure results in an imprisonment within the maximum sentence under Title 18, U.S.C. §§ 1029(a)(2) and

2314. *See* 18 U.S.C. §§ 1029(c)(1)(A)(I), 2314 (each authorizing a maximum sentence of 10 years).

## A. This Court is Authorized to Grant an Upward Departure

 Under section 3553(b) of title 18 of the United States Code, this Court must impose the sentence provided in the Sentencing Guidelines "unless the court finds that there exists an aggravating or mitigating circumstance of a kind, or to a degree not adequately taken into consideration by the Sentencing Commission in formulating the guidelines that should result in a sentence different from that described." 18 U.S.C. § 3553(b); U.S.S.G. § 5K2.0; *Koon v. United States*, 518 U.S. 81, 92, 116 S.Ct. 2035, 135 L.Ed.2d 392 (1996); *United States v. Melvin*, 187 F.3d 1316, 1320 (11th Cir.1999). "When a court finds an atypical case, one to which a particular guideline linguistically applies but where the conduct significantly differs from the norm, the court may consider whether a departure is warranted." *See* U.S.S.G. ch. 1, pt. A, introductory cmt. 4(b).

This Court's freedom in using the unique factors of a case to depart from the Guidelines is discussed by the Eleventh Circuit in *United States v. Melvin*, which establishes a two-part test for appropriateness of departure. *Melvin*, 187 F.3d at 1320. First, this Court must determine whether the Sentencing Commission has prohibited consideration of the factor, in which case departure is prohibited. *Id.* A factor is prohibited when listed in § 5K2.0(d) or when already taken into consideration in the applicable guideline. *Id.*; U.S.S.G. § 5K2.0(d) (prohibiting consideration of race, sex, national origin, creed, religion, and socio-economic status among

other factors). Second, the court must determine whether the factor takes the case outside the heartland of the applicable guideline. *Melvin*, 187 F.3d at 1320; *Koon*, 518 U.S. at 93, 116 S.Ct. 2035. In determining whether a circumstance was taken into consideration, this Court will only consider the sentencing guidelines, and the policy statements and official commentary of the Sentencing Commission. 18 U.S.C.A. § 3553(b); *Koon*, 518 U.S. at 92, 116 S.Ct. 2035.

Applying the *Melvin* test to this case, this Court finds that consideration of the death of Mesika is neither expressly prohibited in the Guidelines nor included in § 2B1.1. Vernier's theft of Mesika's property combined with the aggravating circumstances of the victim's unexplained disappearance (Vernier's relationship with the victim who was last seen with Vernier, the discovery of Mesika's blood splattered throughout the back of the van which was in Vernier's possession until the arrest) clearly shows that this case significantly differs from the heartland of typical cases falling under § 2B1.1.

## B. Upward Departure is Explicitly Encouraged by U.S. Sentencing Guideline § 5K2.1

 The factor taking a case outside the heartland might not be taken into account by the guideline under which the defendant is sentenced, but may be encouraged for consideration in departure by another guideline, policy statement or application note in the Guidelines. Where this occurs, it is always appropriate for the court to make an upward departure based on this factor. *Melvin*, 187 F.3d at 1320; *Koon*, 518 U.S. at 94, 116 S.Ct. 2035.

The United States Sentencing Guidelines explicitly encourages upward depar-

ture where death or serious injury occurs. Section 5K2.1 provides, "If death resulted, the court may increase the sentence above the authorized guideline range." The statutory maximum sentence does not automatically apply. U.S.S.G. § 5K2.1. The sentencing judge is first required to consider circumstances that would normally distinguish between different levels of homicide. *Id.* These include the means by which life was taken, the dangerousness of the defendant's conduct, and the extent to which death or serious injury was intended or knowingly risked. *Id.*

Section 5K2.1 expressly encourages departure in this case for the death of Mesika. For the reasons already stated, this Court finds the evidence of Vernier's responsibility in Mesika's death compelling and grants the government's motion for upward departure.

### C. This Court is Authorized to Consider All Available Evidence in Upwardly Departing from the Sentencing Guideline

 Once the guilt of the defendant has been established, the trial judge is authorized to sentence him based on both the evidence proven beyond a reasonable doubt at trial, and the facts which he believed had been proven by a preponderance of that evidence. *See e.g., McMillan v. Pennsylvania* 477 U.S. 79, 91, 106 S.Ct. 2411, 91 L.Ed.2d 67 (1986) (holding that a state need not prove beyond a reasonable doubt every fact recognized as an exculpatory or mitigating circumstance affecting the severity of the punishment); *Williams v. New York,* 337 U.S. 241, 246–47, 69 S.Ct. 1079, 93 L.Ed. 1337 (1949); U.S.S.G. 6A1.3 cmt. ("The Commission believes that use of a preponderance of the evidence standard is appropriate to meet due process

requirements and policy concerns in resolving disputes regarding application of the guidelines to the facts of a case").

In *Williams v. New York,* the Supreme Court held that it was not a violation of due process for a sentencing judge to consider evidence from out-of-court sources to guide the sentencing decision. *Williams,* 337 U.S. at 250–51, 69 S.Ct. 1079 ("A sentencing judge...is not confined to the narrow issue of guilt. His task within fixed statutory or constitutional limits is to determine the type and extent of punishment after the issue of guilt has been determined"); *Harris v. United States,* 536 U.S. 545, 558, 122 S.Ct. 2406, 153 L.Ed.2d 524 (2002) ("The Court has recognized that this process is constitutional and that the facts taken into consideration need not be alleged in the indictment, submitted to the jury, or proved beyond a reasonable doubt"). In *Williams,* there was no due process violation where the jury found the defendant guilty of murder and the judge assigned a sentence within the statutory range based on his own interpretation of the trial evidence as well as relevant material facts revealed in the pre-sentence investigation which was not considered by the jury. *Williams,* 337 U.S. at 244–45, 251. Included in the out-of-court evidence was the defendant's involvement in thirty burglaries, unrelated but occurring in the same vicinity as the murder. *Id.* at 244, 69 S.Ct. 1079. The burglaries were taken into consideration in the defendant's murder sentence although there were no convictions. *Id.*

 Following *Williams,* this Court may take into consideration the fact that a death occurred in deciding Vernier's sentence. In taking into consideration the aggravating circumstances unique to this case which were not considered by the

Sentencing Commission in establishing the guideline, this Court preserves the uniformity of the Guidelines and assigns a sentence in proportion to an atypical case.

## D. Similar Cases Have Upwardly-Departed from the Guidelines

In *U.S. v. Mayle,* the Sixth Circuit granted a motion for an upward departure, resulting in an increase from 15 to 21 months to 292 to 365 months for a conviction for mail fraud where the underlying conduct involved three homicides. *United States v. Mayle,* 334 F.3d 552, 555 (6th Cir.2003). The court found that the circumstantial evidence showed by a preponderance of the evidence that the defendant killed three men, although there were no convictions and no body recovered in the disappearance of the third victim. The court rejected the defendant's claim that because no body was found there was no evidence of death or murder. *Id.* at 562. In support of its finding of murder, the court noted that the victim was living with the defendant at the time of his disappearance, and the fact that the disappearance coincided with the beginning of the defendant's fraudulent endorsement of the victim's checks. *Id.* The district court concluded that the defendant murdered [the victim] and that the murder constituted relevant conduct because it facilitated the fraud offense for which the defendant was convicted. The district court accordingly increased defendant's base offense level by 23 levels to level 37 pursuant to U.S.S.G. § 5K2.1 because death resulted. *Id.* at 555.

█ This Court finds that the evidence in this case strongly supports the conclusion that Mesika was killed by Vernier and finds that the failure to recover a body is not dispositive to the case. As in *Mayle,*

the victim in this case was a companion of the defendant. The two drove from Texas to Louisiana together, living out of Mesika's van. Mesika's disappearance coincided with Vernier's stealing the van and the beginning of a long series of cash withdrawals on Mesika's credit card with no apparent concern that Mesika could stop him or report the card stolen. Mesika's death facilitated the criminal conduct of making fraudulent withdrawals and transporting stolen items across state lines.

In a case similar to this one, the Second Circuit upheld an upward departure imposing the statutory maximum, finding that a criminal conviction for the sale and transportation of stolen property resulted in the death of the owner of the property although neither of the defendants was charged with homicide. *Rivalta,* 892 F.2d 223, 224–26 (2nd Cir.1989). The sentencing judge considered both government sentencing memoranda providing facts about the death, and the evidence presented at trial. *Id.* at 226. The government argued that, "the inference is unavoidable that [the victim's] death was a result of the transaction in which defendant was the primary participant." *Id.* The sentencing judge agreed that the two events "were 'intertwined' or that there was a 'nexus' between them." *Id.* The *Rivalta* court held that there is "no significant difference between disputes concerning 'relevant conduct' for purposes of calculating offense levels under the Guidelines and those concerning a resultant death for purposes of justifying an upward departure." *Id.* at 230. The court held that the preponderance of the evidence standard justified upward departure where the government presented sufficient circumstantial evidence connecting the defendant with the death, "so that the absence of physical evidence or witness is not dispositive." *Id.* at 231.

Similarly, this Court is authorized to grant upward departure in finding by a preponderance of the evidence that a death resulted from the charged conduct. *Rivalta* is similar to the present case in the defendants' relationship to the victim, their "elaborate scheme" in robbing the victim, "suspicious" conduct leading up to the death, and the ongoing investigation into the death in which the government has not sought an indictment. *Id.* at 230–31.

In *U.S. v. Sweeting,* the Eleventh Circuit upheld an upward departure pursuant to § 5K2.1 as well as §§ 5K2.2 and 5K2.9 (for crimes resulting in injuries or to facilitate or conceal other crimes) for the aggravating circumstances underlying a conviction for possession of a firearm by a felon. *Sweeting,* 933 F.2d 962 (11th Cir.1991). The sentencing judge heard evidence offered by the government describing the defendants' involvement with a street gang responsible for several drive-by shootings. The court found the defendant's possession of the weapons was for the "criminal purpose" of carrying out the gang's activities. *Id.* at 996. Although there was no specific homicide mentioned and neither defendant had been charged with a murder or violent crime, the evidence was sufficient to show that one defendant was the leader of a gang which had engaged in homicides using weapons like those in his possession. *Id.* The court upheld a sentence of 4 years imprisonment, a departure from the Guidelines range of 10 to 16 months, holding that the Guidelines do not contemplate a situation where gun possession by a felon is attached to the criminal purpose of carrying out gang activities including homicide and narcotics trafficking. *Id.*

The *Sweeting* decision supports the conclusion that Mesika's death takes this case sufficiently outside the heartland of Vernier's theft offenses to warrant departure from the Guidelines. Just as gun possession did not carry consideration of gang crimes and homicide, this Court finds that the Commission did not consider homicide as attached to credit card fraud and the interstate transportation of stolen goods.

In *U.S. v. Mellerson,* the Eleventh Circuit again used the preponderance of the evidence standard, finding that a weapons possession conviction was connected to a "crime of violence" for which the defendant was not convicted. *Mellerson,* 145 F.3d 1255, 1256–57 (11th Cir.1998); U.S.S.G. § 4B1.4(b)(3)(A). Here, the defendant allegedly showed up with a loaded revolver at a house where his wife and daughter were and took his daughter away in a stolen car. *Id.* at 1256. The defendant was not convicted of the "crimes of violence" of aggravated assault and armed burglary, but was convicted on three counts of possession of a firearm by a convicted felon. *Id.* Under § 4B1.4(b)(3)(A) of the Guidelines, if the possession is in connection with a violent crime, the defendant's offense level increases to 34. The defendant argued that his offense level should be 33 pursuant to § 4B1.4(3)(B), covering firearms possession *not* involving a crime of violence. The court admitted that the question of whether a conviction was required to warrant the higher offense level under § 4B1.4(b)(3)(A) was a question of first impression in the Eleventh Circuit. Choosing to follow the First and Sixth Circuits, the Court held that a preponderance of the evidence showing that a crime of violence was committed justified the application of the stricter statute. *Id.* at 1257–58. The court points out that the language does not mention conviction for the crime of violence while other sections

of the statute do. *Id.* at 1258. This Court agrees with the *Mellerson* court's reasoning that the absence of any mention of a conviction in the language of the statute shows that the Commission did not intend to make it a requirement. *Id.* This Court therefore agrees with the government that § 5K2.1 is not limited to charged conduct and is a valid basis for departure. (DE # 30 at p. 10).

The Seventh Circuit has upwardly departed based on its finding by a preponderance of the evidence that a defendant convicted of arson also murdered his wife. *U.S. v. Gallagher*, 223 F.3d 511, 514 (7th Cir.2000). The defendant had served a prison sentence for a rape conviction before he met and married his wife. *Id.* at 512. Almost a month after she died from what the court determined to be a staged accident that put her in a coma, four barns on her property burned down and the defendant was later convicted of arson. *Id.* at 514. In sentencing, the government sought an upward departure under U.S.S.G. § 4A1.3 (claiming the criminal history category did not reflect the seriousness of his past criminal conduct) based on its contention that the defendant murdered his wife. *Id.* at 516. Among the evidence considered in determining by a preponderance of the evidence that the defendant was responsible for the death, the court named the defendant's financial motive and his opportunity to commit the crime by his special relationship to the victim. *Id.* at 517. Other evidence linking the defendant to the crime included testimony that the victim had been injured by a blow to the head, the finding that the murder was committed by someone who possessed a key to the house and that the scene had been staged to look like there had been an accident, as if "the individual involved wished to cover up the murder as if he expected to be a suspect." *Id.* The Seventh Circuit held that there was sufficient proof to hold by a preponderance of the evidence that there had been a murder and that the defendant had been responsible. *Id.* at 517–18.

In this case, as in *Gallagher*, the murder was not directly related to the defendant's conviction; nor was it found by the jury that the death had been a murder. This Court finds that Vernier also had the motive and opportunity to murder Mesika by taking advantage of his close relationship to the victim to gain financially by the fraudulent use of Mesika's credit card after his death. Like the defendant in *Gallagher*, Vernier attempted to cover up the scene of the death. The cleaning agents and water and blood stains (belonging to Mesika) show that Vernier attempted to hide a murder scene and evade punishment for the heinous crimes he committed.

## CONCLUSION

This Court agrees with the above-mentioned cases in granting upward departure based on the Sentencing Guidelines' inadequacy in accurately reflecting the seriousness of the defendant's criminal conduct. The circumstances surrounding Vernier's charged crimes, specifically the abundance of evidence pointing to the brutal killing of Ran Mesika by Vernier, sufficiently take this case outside the heartland of typical theft cases falling under § 2B1.1. Failure to recover Mesika's body does not preclude this Court's determination that Vernier is responsible for Mesika's death. The evidence clearly shows—based on the presence of Mesika's blood splattered on the windows, door, and roof of the van, Mesika's blood and tissue found on the tire iron, the attempt to use the cleaning

agents to hide this evidence afterwards, and the impunity with which Vernier used Mesika's credit card without worrying about the consequences—that Vernier murdered Mesika. Therefore, considering the unique and aggravating circumstances of the heinous crime perpetrated by the Defendant, this Court GRANTS the government's motion for upward departure and hereby sentences the Defendant to 210 months, as specified in this Court's Amended Judgment.[1]

1. When this Court imposed sentence on May 10, 2004, the United States Supreme Court had yet to issue its decision in *Blakely v. Washington*, —— U.S. ——, 124 S.Ct. 2531, 159 L.Ed.2d 403 (2004). Recognizing that this decision may impact this Court's sentence, this Court entered an Order on July 27, 2004 directing the parties to file briefs addressing the issue on how *Blakely* affected this Court's Judgment. While the parties disagreed on *Blakely's* impact, both parties agreed (and this Court concurs) that the ultimate arbiter of *Blakely's* impact on this Court's Judgment is the United States Court of Appeals for the Eleventh Circuit. This Court sincerely hopes that the Eleventh Circuit, after examining the totality of circumstances surrounding Mesika's horrific and untimely death, will uphold this Court's Judgment, which was only entered after much thought and reflection. This Court acknowledges that its upward departure and sentence may appear, at first glance, to be extreme. But this Court is also convinced that they are just.