# FOR PUBLICATION

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

UNITED STATES OF AMERICA,
            *Plaintiff-Appellee,*

v.

DAVID KENT FITCH,
            *Defendant-Appellant.*

No. 07-10607

D.C. No.
2:04-cr-262-JCM

OPINION

Appeal from the United States District Court
for the District of Nevada
James C. Mahan, District Judge, Presiding

Argued and Submitted
April 14, 2011—San Francisco, California

Filed September 23, 2011

Before: Alfred T. Goodwin and N. Randy Smith,
Circuit Judges, and Frederic Block, District Judge.*

Opinion by Judge Block;
Dissent by Judge Goodwin

*The Honorable Frederic Block, Senior United States District Judge for the Eastern District of New York, sitting by designation.

18135

## COUNSEL

Mario D. Valencia, Henderson, Nevada; Beau Sterling (argued), Sterling Law, LLC, Las Vegas, Nevada, for the defendant-appellant.

Camille W. Damm, Assistant United States Attorney, District of Nevada, Las Vegas, Nevada, for the plaintiff-appellee.

## OPINION

BLOCK, District Judge:

David Kent Fitch was convicted by a jury of nine counts of bank fraud, two counts of fraudulent use of an access device, two counts of attempted fraudulent use of an access device, two counts of laundering monetary instruments, and one count of money laundering. The applicable Sentencing Guidelines range was 41-51 months. At sentencing, however, the district judge found by clear and convincing evidence that Fitch had murdered his wife, and that her death was the means he used to commit his crimes. Relying on that finding, he imposed a sentence of 262 months.

Fitch appeals his sentence,[1] arguing that the district court committed procedural error and that, in any event, its sentence was substantively unreasonable. Because Fitch has never been charged with his wife's murder, his sentence is a poignant example of a drastic upward departure from the Guidelines range—albeit below the statutory maximum—based on uncharged criminal conduct. We have not had occasion to address a scenario quite like this, but are constrained to affirm.

I

In determining Fitch's sentence, the district court relied on the trial record and undisputed portions of the presentence report (PSR). Since Fitch does not challenge that reliance, *see United States v. Flonnory*, 630 F.3d 1280, 1286 (10th Cir.

---

[1]Fitch also appeals the district court's order denying his pretrial motion to dismiss the indictment based on Sixth Amendment speedy trial grounds. We affirm the district court's order because Fitch did not satisfy his burden of showing that he faced the "actual restraints imposed by arrest and holding to answer" the criminal charges at issue in this case prior to his June 2004 indictment. *See Dillingham v. United States*, 423 U.S. 64, 65 (1975).

2011) ("The district court can properly consider trial testimony for sentencing purposes."); *United States v. Ameline*, 409 F.3d 1073, 1085 (9th Cir. 2005) (en banc) ("[T]he district court may rely on undisputed statements in the PSR at sentencing."), we take the facts from the same sources.[2]

In 1997 and 1998, Fitch spent considerable time in Bogotá, Colombia, where he became romantically involved with Patricia Molano Gutierrez (Molano), a Colombian citizen. Molano moved to England in early 1998, and in mid-1998, Fitch traveled to England to visit her.

While in England, Fitch met Maria Bozi. Romanian by birth, Bozi was a naturalized citizen of the United Kingdom and had lived and worked in England since 1991. Although still romantically involved with Molano, Fitch married Bozi in England on April 23, 1999.

A few weeks after their wedding, Fitch went to the United States while Bozi remained in England and prepared to leave. She sublet her apartment and shipped, sold or stored her personal property. She also opened a United States bank account, in her name only, at Citibank. She transferred $120,000 into the account in July 1999.

Bozi stayed with a former boyfriend, Michael Novin, for a few weeks before she left England. She used Novin's mailing address for her bank and credit card statements. At the end of July, Novin drove Bozi to the airport, where she took a flight to Nevada to meet Fitch.

Soon after arriving in Nevada, Bozi purchased a 1994 Ford Thunderbird. She registered the car in her name only. She also

---

[2]Fitch objected to portions of the PSR, but did not request a hearing pursuant to Federal Rule of Criminal Procedure 32(i)(2) ("The court may permit the parties to introduce evidence on the objections [to the PSR]."). In any event, we do not rely on any of the disputed portions of the PSR.

purchased a $14,000 mobile home and leased space for it at the Lake Shore Trailer Village in the Lake Meade National Recreation Area. Bozi was the sole tenant on the lease and listed herself as the sole owner of the mobile home. She and Fitch moved into the mobile home at the end of August 1999.[3]

Bozi's previously regular phone calls to her mother in Romania and Novin in England stopped a few days after she and Fitch moved into the mobile home. Novin last spoke to Bozi on September 4, when she told him that she and Fitch were going on a "mini trip" for a week or two, and that she would call him when she returned. Bozi did not tell Novin where she and Fitch were going.

Between September 7 and 17, 1999, Fitch withdrew a total of $8,000 from Bozi's Citibank account. On one occasion he made the withdrawal while wearing a hat, sunglasses and a fake mustache. On September 10, Fitch purchased an $8,000 cashier's check payable to Molano.

On September 11, a Citibank representative called Novin trying to reach Bozi regarding, in Novin's words, "some checks and some urgent matter." Novin gave the caller Bozi's phone number in the United States.

On September 13, Fitch deposited a $40,000 check drawn on Bozi's Citibank account into his own account. Four days later, Citibank froze Bozi's account.

On September 18, Novin attempted to contact Bozi to discuss Citibank's phone call, and left a message on her answering machine. Fitch returned Novin's call "half-an-hour later," and told Novin that Bozi had "gone ahead to Vancouver because she had found a job there." At roughly the same time,

---

[3]The record does not reflect where either Bozi or Fitch lived before moving into the mobile home.

Fitch told Gracie Silvers, a neighbor, that Bozi "went back to England."

Concerned that he had not heard from Bozi in several days, Novin contacted the United States Park Service. Prompted by Novin's phone call, park ranger Gary Sebade visited Fitch on September 29. Fitch told Sebade that Bozi had returned to Romania. Earlier that same day, Fitch—calling himself "Mario Bozi"—had used Bozi's health insurance card and account number to schedule hernia surgery for October 5.

On October 1, park rangers saw Fitch loading his truck at the trailer park. They followed Fitch to a dumpster, where they saw him discard several items. Searching the dumpster, the rangers found a receipt, dated July 7, 1999, reflecting the purchase of chloroform by a "Dr. David."

Now suspecting foul play, the rangers sealed Bozi's mobile home with police tape. Fitch did not return to the trailer park, but instead checked into a motel in Las Vegas. On October 9, Bozi's Thunderbird was stolen and the police-tape barrier was broken.

At some point in October, Fitch attempted to sell Lorinda Brodoski "a woman's clothing and shoes and just personal items for a woman [her] size." Brodoski testified at trial that Fitch had told her "he was selling these things because his wife left him." Later that month, Fitch attempted to use Bozi's credit card to purchase $5,000 in synthetic emeralds over the Internet; the card was declined.

While in Las Vegas, Fitch met a man named David Lee Krause. Fitch convinced Krause to give him his personal information, which Fitch then used to obtain duplicates of Krause's social security card and birth certificate. Using those documents, Fitch obtained a Utah driver's license and United States passport; both bore Fitch's photograph, but Krause's name.

Fitch used the Krause passport to travel to London on November 25. There, he married Molano using his assumed identity.

Fitch re-entered the United States on February 7, 2000, again using the Krause passport. The following day, officers with the Henderson (Nevada) Police Department stopped Fitch for speeding. Fitch was driving the 1994 Thunderbird and presented the Krause driver's licence as identification. A routine licence plate search revealed the connection to Bozi, prompting the officers to contact the FBI. The FBI asked them to detain Fitch until federal agents could get to the scene. Since the license plate search had also revealed outstanding warrants against Fitch, the officers placed him under arrest.

Fitch's arrest triggered a full FBI investigation. Between February 8 and 25, 2000, agents seized from Fitch, *inter alia*, a shotgun, three rifles, a revolver, a box of shotgun shells, numerous books,[4] a passport in the name of Maria Bozi and a "briefcase with miscellaneous documents" in Bozi's name. They also recovered the Krause birth certificate, passport and driver's licence.

In addition, the FBI sought information from potential witnesses living in Romania and the United Kingdom through Mutual Legal Assistance Treaty requests (MLATs). As a

---

[4]Including *The Modern Identity Changer*; *How to Make a Silencer for a .45*; *The Paper Trip I, II, and III—The Master Guide to New Identity*; *More Workbench Silencers*; *ID by Mail*; *High-Tech Harassment*; *Pipe and Fire Bomb Designs*; *The Revenge Encyclopedia*; *100 Ways to Disappear and Live Free*; *Make 'Em Talk! Principles of Military Interrogation*; *Hit Man, A Technical Manual for Independent Contractors*; *Improvised Explosives, How to Make Your Own*; *Improvised Radio Detonation Techniques*; *The Death Dealer's Manual*; *Deadly Brew, Advanced Improvised Explosives*; *Dragon's Touch, Weaknesses of Human Anatomy*; *How To Make a Silencer for a .22*; *Methods of Disguise*; *Acquiring New ID*; *New ID in America*; and *Kill Without Joy! The Complete How to Kill Book*.

result of those MLATs, the FBI received witness statements from Novin, Molano and others. None of the potential witnesses had any knowledge of Bozi's whereabouts.

In March 2003, the FBI interviewed Fitch's father. He stated that his son had married a woman in England, but could not recall her name. When asked about Bozi, he stated that he had "no knowledge" of her.

To date, Bozi's whereabouts remain unknown.

## II

### A.   2000 Charges

A criminal complaint filed the day after Fitch's arrest stated that Fitch

> admitted to fraudulently taking money from BOZI's account by using her ATM card and wearing disguises to conceal his identity from bank surveillance cameras. He also admitted to cashing a fraudulent $40,000 check after her disappearance, and concealing the money in an account that he opened under a false name.

On February 15, 2000, the Government indicted Fitch for violating 18 U.S.C. § 922(g)(1), unlawful possession of a firearm by a felon. A superseding indictment filed in June of that year added three additional § 922(g)(1) charges, as well as two counts of possession of false identification documents with intent to defraud the United States, in violation of 18 U.S.C. § 1028(a)(4), and four counts of use of a false passport, in violation of 18 U.S.C. § 1542.

In July 2000, Fitch pleaded guilty to all ten counts without a plea agreement, and was sentenced in November 2000 to 97

months. At the time of sentencing, the FBI's investigation was still ongoing.

## B.   2004 Charges

In June 2004, the Government indicted Fitch on nine counts of bank fraud, in violation of 18 U.S.C. § 1344; two counts of fraudulent use of an access device, in violation of 18 U.S.C. § 1029(a)(2); and two counts of attempted fraudulent use of an access device, in violation of 18 U.S.C. § 1029(a)(2) and (b)(1). Superseding indictments added two counts of laundering monetary instruments, in violation of 18 U.S.C. § 1956(a)(1)(B), and one count of money laundering, in violation of 18 U.S.C. § 1957. A jury convicted Fitch of all sixteen counts in June 2007.[5]

The district court sentenced Fitch on October 19, 2007. The Government sought an upward departure from the advisory Guidelines range of 41-51 months based on the theory that Fitch had killed Bozi, and that her death was the means by which he was able to commit his fraudulent scheme. For his part, Fitch argued that he was entitled to some amount of credit for the seven years he had been incarcerated for crimes that were part of the same scheme.

Explicitly "considering the factors set forth in 18 USC, Section 3553" and giving "due consideration" to the Guidelines, while recognizing that they were "advisory under *Booker*," the district court found that an upward departure was warranted because "the death of Maria Bozi was the means that Mr. Fitch used to effectuate the offenses of which he was found guilty." In support of that conclusion, the court relied on six specific findings:

---

[5]Fitch was also charged with one count of interstate transportation of a stolen motor vehicle, in violation of 18 U.S.C. § 2312, and one count of receipt of a stolen motor vehicle, in violation of 18 U.S.C. § 2313. These two counts were dismissed on the Government's motion.

[O]ne, Mr. Fitch failed to report his wife's disappearance to the police. If you have a loved one who disappears, I think your first reaction is you report the disappearance to the police. Mr. Fitch didn't do that here.

Two, he told various stories concerning her whereabouts, that is that she had gone to Vancouver, that she had returned to Romania, and that she had returned to London. So he told different individuals that asked where she was and he would tell them one or the other of those stories, but the evidence was that he told various stories as to where she had gone.

Three, he tried to sell her clothing and personal effects, including her car.

Four, he remarried shortly after her disappearance without first seeking a divorce. He cannot be married to be remarried, and so the first marriage has to be terminated, and I think here it was terminated by the death of Ms. Bozi.

Five, he had possession of her checkbook, her credit cards, and other personal information that she would have on—that any person would have on their person.

And, six, he raided her accounts and credit cards by deception[,] either disguises or forgery[,] and he withdrew the daily limit of $1,000.00 from her ATM —or from her bank's ATM over a period of about two weeks while wearing disguises.

The district court then reasoned that "causing death to effectuate the fraud scheme is sufficiently outside the heartland of the fraud, forgery, and false statement offenses to warrant a departure from the sentencing guidelines." Citing

§ 5K2.1 of the Guidelines, it considered "the dangerousness of the defendant's conduct, the extent to which death or serious injury was intended or knowingly risked [and] the extent to which the offense level for the offense of conviction already reflects the risk of personal injury." Finding that "Ms. Bozi's death was intended" and noting that "first degree murder, of course, is a very serious offense," the court settled on a "fifteen level upward departure to an offense level of thirty-five."

Applying that offense level to Fitch's criminal history category of III yielded a sentencing range of 210 to 262 months. The district court concluded that the upper limit of that range was "appropriate," and sentenced Fitch accordingly. This appeal followed.

### III

The Sixth Amendment guarantees that a conviction must rest "upon a jury determination that the defendant is guilty of every element of the crime with which he is charged." *United States v. Gaudin*, 515 U.S. 506, 510 (1995). As the Supreme Court has made clear, however, once there is a conviction, the sentencing judge is possessed of extraordinarily broad powers to find the facts that will drive the sentence. This case is a stark example of the diminishment of the role of the jury that can result when those powers reach their outer limits.

**[1]** In *Apprendi v. New Jersey*, 530 U.S. 466 (2000), the Supreme Court relegated the jury's role after conviction to determining "any fact that increases the penalty for a crime beyond the prescribed statutory maximum." *Id.* at 489. In *United States v. Booker*, 543 U.S. 220 (2005), it held that the mandatory Guidelines regime set the functional equivalent of statutory maximums, but that the remedy for the resulting Sixth Amendment violation was to *increase* the discretion of the sentencing judge by making the Guidelines advisory. *See id.* at 233 ("We have never doubted the authority of a judge

to exercise broad discretion in imposing a sentence within a statutory range.”).

**[2]** Even before *Apprendi* and *Booker*, it was clear that a sentencing judge can consider facts that a jury cannot. Thus, the judge can increase the defendant's sentence based—as here—on uncharged conduct, *see Witte v. United States*, 515 U.S. 389 (1995), and even acquitted conduct, *United States v. Watts*, 519 U.S. 148 (1997). Such increases “do not punish a defendant for crimes of which he was not convicted, but rather increase his sentence because of the manner in which he committed the crime of conviction.” *Watts*, 519 U.S. at 154.

While the respective fact-finding roles of the judge and jury are based on constitutional principles, it is Congress that assigns the roles through its power to fix statutory maximums. The unfettered exercise of that power has created some curious scenarios, and this case is a good example. The total statutory maximum for the non-violent crimes of which Fitch was convicted is 360 years.[6] Since, as a practical matter, no sentence would exceed that limit, the district court, and not the jury, had to decide whether Fitch killed Bozi as a means to commit his crimes. By contrast, a defendant charged with selling heroin is entitled to a jury determination of the quantity of heroin sold because that fact increases the statutory maximum for the crime. *See* 21 U.S.C. §§ 841(b)(1)(A) (life for distribution of one kilogram or more), 841(b)(1)(B) (40 years for distribution of 100 grams or more), 841(b)(1)(C) (20 years for distribution *simpliciter*). In other words, Congress is

---

[6]A single count of bank fraud carries a maximum penalty of 30 years’ imprisonment. *See* 18 U.S.C. § 1344. The other relevant maximums are 10 years for access-device fraud and attempted access-device fraud, *see id.* § 1029(a)(2); 20 years for laundering monetary instruments, *see id.* § 1956(a)(1)(B); and 10 years for money laundering, *see id.* § 1957. The district court could have sentenced Fitch consecutively on each count with no Sixth Amendment implications. *See Oregon v. Ice*, 555 U.S. 160, 172 (2009).

free, under current Sixth Amendment jurisprudence, to say that a jury must decide how much heroin a defendant sold, but that a judge may decide the far more significant question of whether Fitch murdered his wife as a means to commit his crimes.

The *Booker* Court was well aware that "once determinate sentencing had fallen from favor, American judges commonly determined facts justifying a choice of a heavier sentence on account of the manner in which particular defendants acted." 543 U.S. at 236. It was legislatively prescribed sentencing enhancements, like those reflected in the Guidelines, that had changed the fact-finding dynamics: "As the enhancements became greater, the jury's finding of the underlying crime became less significant. And the enhancements became very serious indeed." *Id.*

It was this "new set of circumstances" that first animated the Supreme Court "to address the question how the right of jury trial could be preserved, in a meaningful way guaranteeing that the jury would still stand between the individual and the power of the government under the new sentencing regime." *Id.* at 237. Its answer was "not motivated by Sixth Amendment formalism, but by the need to preserve Sixth Amendment substance." *Id.* And it did that in *Apprendi* by embracing the statutory maximum set by Congress as the line of demarcation between the roles of judge and jury.

To date, only one Supreme Court justice has railed against this marginalization of the jury's role. In *Gall v. United States*, 552 U.S. 38 (2007), Justice Scalia expressed his view that "the door . . . remains open for a defendant to demonstrate that his sentence, whether inside or outside the advisory Guidelines range, would not have been upheld but for the existence of a fact found by the sentencing judge and not by the jury." *Id.* at 60 (Scalia, J., concurring). And dissenting from the denial of a petition for certiorari in *Marlowe v. United States*, 129 S. Ct. 450 (2008), he opined that "[a]ny

fact (other than a prior conviction) which is necessary to support a sentence exceeding the maximum *authorized by the facts established by a plea of guilty or a jury verdict* must be admitted by the defendant or proved to a jury beyond a reasonable doubt." *Id.* at 451 (quoting *Booker*, 543 U.S. at 244) (emphasis added).

## IV

It is problematical whether much of the Sixth Amendment's substance has been preserved in the present case, given the 360-year statutory maximum Fitch faced. It nonetheless remains the law that the sentencing judge has the power to sentence a defendant based upon facts not found by a jury up to the statutory maximum, and that "the defendant has no right to a jury determination of the facts that the judge deems relevant." *Booker*, 543 U.S. at 233; *see also United States v. Treadwell*, 593 F.3d 990, 1017 (9th Cir. 2010) (joining "the Fourth, Sixth, and Seventh Circuits in holding that [Justice Scalia's] argument is too creative for the law as it stands" (citations and internal quotation marks omitted)).

**[3]** The only restrictions that the Supreme Court has imposed on a district court's power to impose a sentence less than the statutory maximum are that the sentence must not be tainted by procedural error, and that it must not be substantively unreasonable. *See Rita v. United States,* 551 U.S. 338, 341 (2007). We address in turn Fitch's contentions that his sentence was both.

### A.   Procedural Error

We set forth the standard for determining procedural error in *United States v. Carty*, 520 F.3d 984 (9th Cir. 2008):

> It would be procedural error for a district court to fail to calculate—or to calculate incorrectly—the Guidelines range; to treat the Guidelines as mandatory

instead of advisory; to fail to consider the § 3553(a) factors; to choose a sentence based on clearly erroneous facts; or to fail adequately to explain the sentence selected, including any deviation from the Guidelines range.

*Id.* at 993. Fitch does not challenge the district court's Guidelines calculations, but argues that its sentence was procedurally erroneous in all other respects.

## 1. *Factual Findings*

The factual findings underlying a district court's sentence are reviewed for clear error. *See United States v. Showalter*, 569 F.3d 1150, 1159 (9th Cir. 2009). "In order to reverse a district court's factual findings as clearly erroneous, we must determine that the district court's factual findings were illogical, implausible, or without support in the record." *United States v. Spangle*, 626 F.3d 488, 497 (9th Cir. 2010).[7]

**[4]** In applying that standard of review, we bear in mind two things. First, in this circuit, "where a severe sentencing enhancement is imposed on the basis of uncharged or acquitted conduct, due process may require clear and convincing evidence of that conduct." *Treadwell*, 593 F.3d at 1000. Second, "[a] sentencing judge may appropriately conduct an inquiry broad in scope, largely unlimited as to the kind of information he may consider, or the source from which it may come." *United States v. Vanderwerfhorst*, 576 F.3d 929, 935 (9th Cir. 2009) (internal alteration and quotation marks omitted); *see also* U.S.S.G. § 6A1.3(a) ("In resolving any dispute

---

[7]The Government argues that we should review the district court's factual findings for plain error—not clear error—because Fitch failed to object below. *See United States v. Santiago*, 466 F.3d 801, 803 (9th Cir. 2006) ("[A]bsent specific objection by the defendant, the plain error standard controls."). Because we find that the district court did not commit clear error, we need not reach the question whether it committed plain error. *See United States v. Alonso*, 48 F.3d 1536, 1546 n.5 (9th Cir. 1995).

concerning a factor important to the sentencing determination, the court may consider relevant information without regard to its admissibility under the rules of evidence applicable at trial, provided that the information has sufficient indicia of reliability to support its probable accuracy.").

**[5]** Of the district court's six findings of fact, *see supra* at 18146, Fitch challenges three: that he failed to report Bozi's disappearance to the police; that he married Molano without first seeking a divorce from Bozi; and that he tried to sell Bozi's clothing, personal effects and car. The first two of those facts are undisputed. The third was established through Brodoski's testimony at trial; the district court did not clearly err in being clearly convinced of its veracity.

**[6]** Fitch also challenges the ultimate inferences that the district court drew from all six findings: that "Mr. Fitch caused Ms. Bozi's death," and that "the death of Maria Bozi was the means that Mr. Fitch used to effectuate the offenses of which he was found guilty." But we cannot remotely say that those interferences are "illogical, implausible, or without support in the record." *Spangle*, 626 F.3d at 497. The district court was confronted with a defendant who had failed to report his wife's disappearance, gave several inconsistent— and, in light of his possession of her passport, implausible— statements as to her whereabouts, and tried to dispose of her clothes and personal effects. He then used her bank account, credit card and health insurance—sometimes through forgery and deception—and eventually married a former girlfriend while still ostensibly married to his missing wife. It was eminently reasonable for the district court to infer that Bozi was dead, that Fitch knew she was dead, and that he had brought about her death in order to pillage her assets.

## 2.  *Explanation of Sentence*

**[7]** Fitch argues that the district court did not adequately explain why it chose a 15-level upward departure and why it

sentenced him to the top of the resulting Guidelines range. We disagree. We find the district court's references to the seriousness of Fitch's conduct and resulting harm to Bozi more than adequate to explain both its decision to depart drastically and its ultimate sentence. *See United States v. Blinkinsop*, 606 F.3d 1110, 1114 (9th Cir. 2010) ("Adequate explanation not only derives from the judge's pronouncement of the sentence, but may also be inferred from the PSR or the record as a whole." (citation, internal quotation marks and alteration omitted)).

### 3. *Treatment of the Guidelines and § 3553(a) Factors*

**[8]** Fitch's arguments that the district court treated the guidelines as mandatory and failed to consider the factors set forth in § 3553(a) are demonstrably false based on the transcript of Fitch's sentencing hearing, at which the district court explicitly recognized both the advisory nature of the Guidelines and the importance of § 3553(a). In any event, a district court "need not tick off each of the § 3553(a) factors to demonstrate it has considered them." *Carty*, 520 F.3d at 992. Our review of the record satisfies us that the district court took great pains to fashion its sentence in light of the factors.

### B. Substantive Reasonableness

"In determining substantive reasonableness, we are to consider the totality of the circumstances, including the degree of variance for a sentence imposed outside the Guidelines range." *Carty*, 520 F.3d at 993. "For a non-Guidelines sentence, we are to give due deference to the district court's decision that the § 3553(a) factors, on a whole, justify the extent of the variance." *Id.* (internal quotation marks omitted). "We may not reverse just because we think a different sentence is appropriate." *Id.*

### 1. *Bozi's Murder*

Fitch principally argues that the district court's sentence was unreasonable because it was based on a consideration of

an improper factor, namely Bozi's murder. He first argues that the district court should not have considered that factor because there was no clear and convincing evidence to establish it. This is simply a recapitulation of his principal claim of procedural error, and we have already addressed it as such.

**[9]** Given that Fitch's involvement in Bozi's death was factually established, the district court certainly was not unreasonable in giving it great weight. Guidelines § 5K2.0(a)(1) states that

> [t]he sentencing court may depart from the applicable guideline range if . . . there exists an aggravating or mitigating circumstance, of a kind, or to a degree, not adequately taken into consideration by the Sentencing Commission in formulating the guidelines that, in order to advance the objectives set forth in [§ 3553(a)], should result in a sentence different from that described.

Death is one such aggravating circumstance. *See id.* § 5K2.1. The Guidelines further state that "a substantial increase may be appropriate if the death was intended or knowingly risked or if the underlying offense was one for which base offense levels do not reflect an allowance for the risk of personal injury, such as fraud." *Id*.

**[10]** Having determined that Fitch intended to murder Bozi, it was reasonable for the district court to substantially increase Fitch's sentence. Although the "departure" language of the Guidelines is no longer apt in the post-*Booker* world, a district court is still entitled to consider their explicit recognition that a Guidelines sentence may not adequately account for behavior as atypical and extreme as murder. *See Booker*, 543 U.S. at 245 (sentencing courts still required to consider Guidelines).

We note, moreover, that the increase was well short of the Guidelines range for both first-degree murder (life) and second-degree murder (324-405 months) for someone in Fitch's criminal history category. Finally, while all parties agree that the effect of uncharged conduct on Fitch's sentence was unusually weighty, it is not unprecedented. *See United States v. Mayle*, 334 F.3d 552, 565, 567-68 (6th Cir. 2003) (upholding 23-level departure based on uncharged murders of defendant's identity-theft victims); *United States v. Vernier*, 335 F. Supp. 2d 1374, 1376-77 (S.D. Fla. 2004) (15-level departure for uncharged murder by which defendant committed access device fraud), *aff'd*, 152 F. App'x 827 (11th Cir. 2005).[8]

## 2.   *Prior Incarceration and Pre-Indictment Delay*

**[11]** Fitch also argues that the district court failed to consider either his incarceration on the 2000 charges or the pre-indictment delay on the 2004 charges. The district court found that the judge who sentenced Fitch on the 2000 charges had not taken the facts driving the second sentence (most notably Bozi's death) into account. Since we see no basis on which to question that finding, we hold that the district court was not required to consider the prior incarceration. *Cf.* U.S.S.G. § 5G1.3 (prior offense must be for conduct that increases sentence for current offense to warrant consideration). We likewise hold that pre-indictment delay was not a relevant sentencing factor.[9]

---

[8]It should be noted that both *Mayle* and *Vernier* date from the pre-*Booker* era, when departures were judged by far stricter rules than the "reasonableness" standard we apply today.

[9]In his reply brief, Fitch alludes to his good behavior and medical problems while incarcerated. Although the district court did not mention either factor at sentencing, they were prominently addressed in Fitch's sentencing memorandum: Three paragraphs under a separate heading were devoted to Fitch's medical issues, and one paragraph of the three discussing his incarceration was devoted to his good behavior. We are satisfied, in the circumstances, that the district court considered both factors.

V

For the foregoing reasons, the district court's judgment is

AFFIRMED.

---

GOODWIN, Circuit Judge, dissenting:

While the evidence of aggravated criminal exploitation of the victim here would support an upward departure from the Sentencing Guidelines, I cannot agree with the majority that there is clear and convincing evidence in the record upon which the district court could find that Fitch committed pre-meditated murder in connection with the fraud charged. *See United States v. Hinkson*, 585 F.3d 1247, 1262 (9th Cir. 2009) (en banc) (factual findings are clearly erroneous when they are "without 'support in inferences that may be drawn from the facts in the record,' " quoting *Anderson v. City of Besse-mer City, N.C.*, 470 U.S. 564, 577 (1985)). I would therefore remand this case for resentencing. *See United States v. Carty*, 520 F.3d 984, 993 (9th Cir. 2008) (en banc) (holding that it would be procedural error for a court "to choose a sentence based on clearly erroneous facts").

Despite the advisory nature of the Sentencing Guidelines, the expanding volume of appeals from federal criminal sen-tences cautions us not to affirm a significant upward departure from them simply because the defendant deserves it. *See United States v. Staten*, 466 F.3d 708, 710 (9th Cir. 2006) ("[A]s we have repeatedly held in the aftermath of *Booker*, we continue to have a duty to review district courts' required application of the Guidelines. We do so to assure that the dis-trict courts properly appreciate the advice offered by the now-advisory Guidelines before factoring that advice into their determination, under 18 U.S.C. § 3553(a), of the appropriate sentence."). A sentencing order giving consideration to the

willful and systematic exploitation of the victim's personal possessions, her absence, and her helplessness could support a significant departure from the Guidelines range—whether she is dead or alive. *See* U.S.S.G. § 5K2.0. (stating that an upward departure is warranted where "there exists an aggravating circumstance, of a kind, or to a degree, not adequately taken into consideration by the Sentencing Commission in formulating the guidelines"). There is sufficient evidence of Fitch's involvement with Bozi's disappearance to support such a departure from the initial Guidelines calculation.

The district court, however, increased Fitch's sentence by seventeen years under § 5K2.1 based on a finding of premeditated murder. Due to the severity of the increase, this finding must be based on clear and convincing evidence. *See United States v. Treadwell*, 593 F.3d 990, 1000 (9th Cir. 2010) ("[W]here a severe sentencing enhancement is imposed on the basis of uncharged or acquitted conduct, due process may require clear and convincing evidence of that conduct."). Section 5K2.1 states that "a substantial increase may be appropriate if the death was intended or knowingly risked or if the underlying offense was one for which base offense levels do not reflect an allowance for the risk of personal injury, such as fraud." While the district court stated there was clear and convincing evidence to support the application of this section, it cited no evidence that Bozi was dead, much less how she died, or, assuming that Bozi was dead because of the elapsed time since she was last known to be alive, the degree of Fitch's involvement in her disappearance.

The sentencing court could only assume that Bozi was dead from the circumstances of her unexplained disappearance. Indeed, her death was not a necessary predicate to the fraud committed. Yet "[t]he extent of the [sentence] increase should depend on the dangerousness of the defendant's conduct, the extent to which death or serious injury was intended or knowingly risked, and the extent to which the offense level for the offense of conviction . . . already reflects the risk of personal

injury." U.S.S.G. § 5K2.1. The district court could not evaluate the dangerousness of Fitch's conduct or the extent to which Bozi's presumed death was intended or knowingly risked because the record is silent on these factors.

We simply do not know any of the circumstances of Bozi's disappearance. We know that she has disappeared and that Fitch immediately exploited her disappearance for his own benefit. While Fitch may indeed have been played a causative, or a concealing, role in Bozi's disappearance, the record contains no evidence that sheds light on the manner of his involvement or the degree of his involvement. There is certainly no clear and convincing evidence of premeditated murder. The district court's finding is simply not supported by the record. The substantial departure applied pursuant to § 5K2.1 was therefore an abuse of discretion. Accordingly, I respectfully dissent.