**NOT FOR PUBLICATION**

FILED

DEC 6 2017

MOLLY C. DWYER, CLERK
U.S. COURT OF APPEALS

UNITED STATES COURT OF APPEALS

FOR THE NINTH CIRCUIT

| | |
|---|---|
| UNITED STATES OF AMERICA, | No. 15-50538 |
| Plaintiff-Appellee, | D.C. No.<br>8:12-cr-00011-CJC-1 |
| v. | |
| JULIO GABRIEL DIAZ, | MEMORANDUM* |
| Defendant-Appellant. | |

Appeal from the United States District Court
for the Central District of California
Cormac J. Carney, District Judge, Presiding

Argued and Submitted October 6, 2017
Pasadena, California

Before: KLEINFELD, GRABER, and CHRISTEN, Circuit Judges.

Julio Gabriel Diaz, a former physician, was convicted of 79 counts of

distribution of controlled prescription drugs, in violation of 21 U.S.C. § 841(a)(1),

and was sentenced to a term of 327 months in prison. Diaz appeals, assigning

errors to the district court's evidentiary rulings, its jury instructions, its imposition

---

\* This disposition is not appropriate for publication and is not precedent
except as provided by Ninth Circuit Rule 36-3.

of a sentence beyond the statutory maximum for counts 86 and 87, and its acceptance of the drug quantity calculation in the Pre-Sentencing Report (PSR).[1] Diaz also argues that the enhancement of his sentence based on facts found solely by the district court violates the Fifth and Sixth Amendments. We have jurisdiction pursuant to 28 U.S.C. § 1291, and we affirm Diaz's conviction but vacate his sentence and remand to the district court for resentencing.

1. Diaz contends that the district court erred by allowing the government to introduce evidence of uncharged patient deaths. The use of such evidence here is troubling, especially because the cause of one of the deaths was, as the government concedes, cancer, not drug abuse. Moreover, although some of the patient deaths could have been relevant to prove intent, knowledge, and absence of mistakes,[2] FED R. EVID. 404(b), testimony—accompanied by photographs—of the people whose lives were ruined, allegedly by the easy access to drugs facilitated by Diaz, was of "extremely limited" probative value. *United States v. Brooke*, 4 F.3d 1480, 1485 (9th Cir. 1993). But given the voluminous evidence arrayed against Diaz,

---

[1] Diaz's objection that an expert witness improperly testified as to a legal conclusion is addressed in an opinion filed concurrently with this memorandum disposition.

[2] For example, Diaz's statements to Deputy John Coyle in the course of the latter's investigations into a patient's death betrayed his knowledge of that patient's "dependency issues."

2

any error was harmless because "it is more probable than not that the error[] did not materially affect the verdict." *United States v. Waters*, 627 F.3d 345, 358 (9th Cir. 2010) (internal quotation marks omitted). The inadmissible evidence comprised a small portion of the witness's overall testimony, and the government did not emphasize the prejudicial evidence. *See, e.g., United States v. McElmurry*, 776 F.3d 1061, 1070 (9th Cir. 2015); *Brooke*, 4 F.3d at 1486–88.

2. Diaz objects, for the first time on appeal, to some of the testimony by doctors from local hospitals. The doctors' out-of-court communications were not hearsay because they were not offered for the truth of the matter asserted; rather, they explained why the doctors contacted Diaz about his patients and, later, flagged him to the authorities. Some of the doctors' testimony was relevant only as evidence that Diaz's prescriptions were so excessive that they could not have been motivated by genuine medical concern for his patients. Such testimony constitutes expert opinion,[3] and the doctors should not have been allowed to offer it because they testified as lay witnesses.

Nevertheless, Diaz has not shown that any error affected his substantial rights. There was ample testimony from expert witnesses that Diaz's prescription

---

[3] Indeed, the government argued to the jury in closing that: "[T]hese aren't lay people. These are other doctors. These are other doctors. They would not do something like that lightly."

practices were truly egregious and could not have been motivated by legitimate medical purposes. For example, Dr. Chavez opined that one of Diaz's patients was prescribed a quantity of hydrocodone that is three times the maximum dose typically prescribed. He also stated that the standard procedure is to restrict the prescription of opiates to one month's usage rather than the one-year supply that Diaz doled out to another of his patients. The testimony of the other expert witness, Dr. Munzing, reinforced the conclusion that Diaz's methods of pain management were not tethered to the standard of care set by the medical profession, and there was no expert testimony to the contrary.

3. Diaz also disputes the admissibility of summary exhibit Gx 1, arguing first that the government did not lay a proper foundation for the underlying documents, comprising exhibit Gx 2, and second that Gx 1 was not a proper summary of Gx 2. Gx 1 and Gx 2 were introduced into evidence through Dr. Lambert, the case manager of the emergency department at Santa Barbara Cottage Hospital. Because Dr. Lambert worked with the emergency department's computer database, the district court did not abuse its discretion in ruling that a proper foundation was laid for Gx 2 to be admitted. *See United States v. Childs*, 5 F.3d 1328, 1334 (9th Cir. 1993). The district court might have erred, however, in

admitting Gx 1 into evidence. Gx 1 was grossly misleading[4] and went beyond mere summary. Its defects were so grave that they could have affected not only the summary's weight, but also its admissibility. *See* FED. R. EVID. 1006.

But on the facts of this case, any error was harmless. There was a tremendous amount of evidence in the record to establish beyond a reasonable doubt that Diaz did not prescribe the drugs in a good faith attempt to conform to professional standards for appropriate pain management. Former patients related that they picked up prescriptions without having been physically examined by Diaz. Robert Scott testified that he called Diaz after his son, Corey Scott, had been admitted to the emergency room, to dissuade the doctor from prescribing any more opiates to Corey. According to Robert Scott, "[Diaz] just basically said, 'He's an adult, he can do whatever he wants.'" A former employee in Diaz's clinic testified that she relayed information to Diaz about Adam Montgomery selling his pills, and that she informed Diaz of track marks on Montgomery's arms. Diaz also appeared to have ignored a plea from Dr. Cervantes to stop prescribing drugs to Marlo Cochrane, a patient whom Dr. Cervantes was treating for addiction and anxiety. Taryn Reed testified that Diaz would break up her prescriptions, date them differently, and direct her to different pharmacies where she could have them

---

[4] For example, Gx 1 included prescriptions that were not written by Diaz.

filled. Michael Tupper recounted that he apprised Diaz of his emergency room visits, and strived to reassure the doctor that he had not "throw[n] him under the bus . . . so to speak." Diaz thanked Tupper each time. In response to the one time that Tupper had to be admitted to hospital after suffering a seizure while waiting for his medication at the pharmacy, Diaz allegedly said: "Next time try to get in here sooner so that doesn't happen again." Taken as a whole, the evidence overwhelmingly proved that Diaz did not write the charged prescriptions for a legitimate medical purpose.

4. Diaz claims, for the first time on appeal, that the admission of complaints made to the Drug Enforcement Agency (DEA) and to the California Medical Board (CMB) violated his rights under the Confrontation Clause because those complaints were jointly filed by physicians, several of whom did not testify at his trial. Because there was sufficient evidence that the local physicians' complaints to the DEA and CMB were chiefly motivated by a desire to shield patients, they were non-testimonial, and the district court did not commit plain error under the Confrontation Clause by admitting the complaints into evidence. *Williams v. Illinois*, 567 U.S. 50, 83–84 (2012).

5.  Towards the close of his testimony, Dr. Chavez was asked: 'In your opinion when the defendant wrote the prescriptions with which he has been charged, was he acting as a medical doctor?." Dr Chavez responded:

> No.  In fact, this is more like a drug dealer.  You don't - - you know, if you're a physician and you prescribe drugs knowing full well they're going to be misused, abused, or misdirected, you are actually potentially worse than a drug dealer because you know better.
>
> A drug dealer doesn't know better.  They're just there to sell drugs.  But to do this is highly inappropriate, so, yes, there was no legitimate reason for these drugs.

Diaz belatedly takes exception to Dr. Chavez's reply on the grounds that it violates Federal Rule of Evidence 704(b) which prohibits, in a criminal case, an expert witness from "stat[ing] an opinion about whether the defendant did or did not have a mental state or condition that constitutes an element of the crime charged or of a defense."  Because Dr. Chavez's answer was ambiguous and susceptible of differing interpretations, the district court did not plainly err by allowing it to be considered by the jury.

6.  For the first time on appeal, Diaz challenges as hearsay CMB Investigator Garcia's testimony that Diaz's medical license was revoked in 2012.  The revocation, which occurred seven months after Diaz was indicted, was relevant only as evidence that Diaz's practices were so out of the ordinary that the CMB

7

saw fit to ban him from practicing medicine. Offered for this purpose, the evidence was hearsay and should have been excluded. *United States v. Stinson*, 647 F.3d 1196, 1210–11 (9th Cir. 2011). Diaz has not established, however, that any error by the district court affected his substantial rights, and relatively little time and emphasis were given to the disputed part of Garcia's testimony.

7. Diaz also faults the jury instructions. But the district court's jury instructions track the elements of the crime as spelled out by this court in *United States v. Feingold*, 454 F.3d 1001, 1008 (9th Cir. 2006). His argument is therefore unpersuasive.

In addition, Diaz takes exception to the district court's refusal to give the jury his proposed good faith instruction. This contention is also unavailing. First, a physician who prescribed drugs with "good intentions in the exercise of professional judgment as to the patient's needs" cannot have meant to "distribute or dispense them outside the course of professional practice," so the jury instructions that the district court gave adequately covered Diaz's defense. Second, this court has repeatedly approved jury instructions that evince an objective standard for good faith. *See United States v. Hayes*, 794 F.2d 1348, 1351 (9th Cir. 1986); *United States v. Boettjer*, 569 F.2d 1078, 1081 (9th Cir. 1978). Insofar as Diaz's proposed good faith instruction intimates that his subjective

belief in the propriety of his methods should have entitled him to acquittal, the instruction was mistaken and properly refused by the district court.

8. Diaz asserts that even if each one of the claimed errors is individually harmless, they collectively operated to deny him a fair trial. "[T]he cumulative effect of numerous errors may support reversal." *United States v. Lloyd*, 807 F.3d 1128, 1168 (9th Cir. 2015) (internal quotation marks omitted). "In those cases where the government's case is weak, a defendant is more likely to be prejudiced by the effect of cumulative errors." *Id.* (internal quotation marks omitted). But this is not such a case. Diaz prescribed more than 5 million opiate pills between 2008 and 2011, with some patients being prescribed, on average, more than 60 tablets per day. There was also overwhelming evidence attesting to Diaz's insouciance in the face of warnings by concerned family members, other physicians, and even his own employees, that his patients were suffering from drug addiction. The sheer quantity of drugs that Diaz prescribed, ostensibly for pain management, convincingly demonstrated that he did not attempt, in good faith, to adhere to the norms of the American medical profession. Reviewing the record as a whole, "it is more probable than not that the error[s] did not materially affect the verdict." *United States v. Morales*, 108 F.3d 1031, 1040 (9th Cir. 1997) (en banc).

9.  Diaz points out, and the government concedes, that the district court plainly erred by sentencing beyond the statutory maximum on counts 86 and 87. Diaz also attacks, for the first time on appeal, the drug quantity calculation in his PSR.  We are unable to identify the prescriptions that contributed to the marijuana equivalent of 181,189 grams as reported in the PSR.[5]  Nor have we been able to determine the version of the guidelines that furnished the drug equivalencies recited by the PSR.[6]  As the record is too scant to permit appellate review of the Guidelines calculation, we vacate Diaz's sentence and remand for resentencing. *See United States v. Emmett*, 749 F.3d 817, 820–22 (9th Cir. 2014).

10.  Finally, Diaz argues that increasing his sentence from 18 months, based only on facts found by the jury, to 327 months, based on facts found by the court,

---

[5] Critically, the government was unable to reproduce this figure in its briefing.

[6] The government suggests that the equivalency is the same across the 2011 and 2015 Guidelines – one unit of hydrocodone is to one gram of marijuana – and that the equivalency between one gram of hydrocodone and 6,700 grams of marijuana that is reproduced in the PSR is attributable to a "typographical error." But the Sentencing Commission amended the Guidelines in 2015 to base the marijuana equivalency of hydrocodone solely on its weight.  U.S.S.G., supp. to app. C, amend. 793 (eff. Nov. 1, 2015).  Under the amendment, one gram of hydrocodone equaled 6,700 grams of marijuana.  *Id.*  Because Diaz was sentenced on December 7, 2015, it is entirely possible that the PSR employed an equivalency of one gram of hydrocodone to 6,700 grams of marijuana to arrive at a base level offense of 38.  In any event, remand is required because the government cannot recreate the calculation.

violated the Fifth and Sixth Amendments as construed in *Apprendi v. New Jersey*, 530 U.S. 466 (2000), and *Blakely v. Washington*, 542 U.S. 296 (2004). As he recognizes, this argument is foreclosed by our precedents. *United States v. Fitch*, 659 F.3d 788, 795–96 (9th Cir. 2011).

**Conviction AFFIRMED; Sentence VACATED and REMANDED for resentencing.**